A09A1991, A09A2093. McKENZIE v. THE STATE (two cases).

(685 SE2d 333)

JOHNSON, Presiding Judge.

A jury convicted Belinda McKenzie and her aunt, Emma McKenzie, of twenty counts of identity fraud and four counts of forgery in the first degree. In Case No. A09A1991, Belinda McKenzie alleges the evidence was insufficient to support her convictions for identity fraud, the state failed to prove venue, and the continuing witness rule was violated. In Case No. A09A2093, Emma McKenzie alleges the same errors. Because the appeals involve the same set of facts, we have combined them in the interest of judicial economy.

1. The McKenzies first contend the evidence was insufficient to support their convictions for identity fraud. We disagree.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence; moreover, this Court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. Resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the fact-finder, not this Court. As long as there is some evidence, even though contradicted, to support each necessary element of the state's case, this Court will uphold the jury's verdict.[1]

Viewed in that light, the evidence shows that a law firm, Ganek, Wright & Dobkin, hired Emma McKenzie on December 7, 2004 to work in its DeKalb County office. She was terminated from employment on March 3, 2005, because of poor performance and because she spent an inordinate amount of time on her personal cell phone.

---

[1] (Citations and punctuation omitted.) *Lee v. State*, 283 Ga. App. 826 (1) (642 SE2d 876) (2007).

In April 2005, David Armata, the firm's comptroller, discovered that one of the firm's accounts was out of balance and, upon investigation and contact with SunTrust Bank, learned that numerous fraudulent checks had been cashed and that more than forty blank checks were missing from the firm.

Subsequent investigation suggested that Emma McKenzie stole the blank checks, which were kept by the printer in her cubicle. The investigation also concluded that Emma recruited Belinda McKenzie to help her cash the checks, and Belinda then recruited six other women to go into banks and cash the checks.

All six of the women who cashed the checks were co-indictees in this case, and all six of them pled guilty and testified for the state at the trial. According to the women, the McKenzies provided them with checks payable to each woman, the women cashed the checks, and then they gave the McKenzies most of the proceeds from the checks. Bank videotape surveillance cameras recorded the women cashing the checks. When one of the women learned that the police were looking into the checks being cashed, she asked Belinda McKenzie what she was going to do and Belinda replied that she was not going to do anything because it "wasn't her face on the camera. It was mine."

Because the McKenzies knew that the bank would call the firm to verify the checks, Emma would answer the phone before the receptionist could and give fraudulent verification information to the bank teller. In fact, employees at the firm's eight-person office complained that Emma would answer incoming calls before the receptionist could answer the phone, even when the receptionist was not busy or on another line. This action continued even after Emma was reprimanded for it. Employees also complained that Emma was on her cell phone continuously in the hallway outside her office, and this action continued even after she was reprimanded. In addition, cell phone records between Belinda and Emma McKenzie showed a spike in activity around the date and time of each check cashing, and employment records show that Emma was at work every time one of the checks was cashed. At least one of the women cashing checks for the McKenzies testified that Belinda McKenzie usually waited outside the bank while the checks were cashed, and she was on her cell phone a lot. The woman heard Belinda say the name "Emma" several times when she was on her cell phone. Over the course of the three months Emma worked for the firm, the McKenzies stole, forged, and cashed over twenty checks totaling $425,000.

The McKenzies complain that the essential elements of identity fraud were not proven. Specifically, they argue that neither one of them used or possessed any identifying information of Ganek, Wright & Dobkin, and they should have been charged with forgery

and not identity fraud. We disagree.

At the time of the McKenzies' actions in this case, the identity fraud statute provided:

A person commits the offense of identity fraud when without authorization or permission of a person with the intent unlawfully to appropriate resources of . . . that person, . . . to his or her own use or to the use of a third party he or she . . . [a]ccesses or attempts to access the resources of a person through the use of identifying information.[2]

And the legislature specifically noted that identifying information "shall include, but not be limited to . . . [c]hecking account numbers . . . or [a]ny other numbers or information which can be used to access a person's or entity's resources."[3]

As outlined above, the evidence showed that the McKenzies concocted a scheme whereby Emma McKenzie stole the law firm's checks, which contained separate individual check numbers, the firm name, and the firm checking account number, inserted an amount and forged a firm lawyer's signature, and then Belinda McKenzie recruited other women to cash the checks while Emma McKenzie intercepted calls from the bank and gave false verification information. This evidence that the McKenzies accessed the firm's financial resources by using its identifying information, viewed in the light most favorable to the prosecution, was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that both Belinda and Emma McKenzie were guilty of 20 counts of identity fraud.[4]

2. The McKenzies argue that the identity fraud venue statute was unconstitutionally applied to avoid prosecuting the crimes in the counties in which they occurred. We disagree. OCGA § 16-9-125, which falls under the "Forgery and Fraudulent Practices" section of the Georgia Code, provides:

The General Assembly finds that identity fraud involves the use of identifying information which is uniquely personal to the consumer or business victim of that identity fraud and

---

[2] OCGA § 16-9-121 (2) (2003). The legislature substantially rewrote this Code section in 2007. However, because the McKenzies' crimes occurred in 2004 and 2005, the 2007 amendment is not applicable in this case.

[3] OCGA § 16-9-120 (4) (D), (Q) (2003).

[4] See *Archer v. State*, 291 Ga. App. 175, 176 (1) (661 SE2d 230) (2008) (upholding identity fraud conviction where defendant stole employer's check and forged them as payable to himself); *Lee*, supra at 827 (1) (upholding identity fraud conviction where defendant attempted to access company's resources through the use of its bank account information and fraudulent payroll checks).

which information is considered to be in the lawful possession of the consumer or business victim wherever the consumer or business victim currently resides or is found. Accordingly, the fraudulent use of that information involves the fraudulent use of information that is, for the purposes of this article, found within the county where the consumer or business victim of the identity fraud resides or is found. Accordingly, in a proceeding under this article, the crime will be considered to have been committed in any county where the person whose means of identification or financial information was appropriated resides or is found, or in any county in which any other part of the offense took place, regardless of whether the defendant was ever actually in such county.[5]

The Supreme Court has found this venue statute constitutional even as to a person who commits no act in the county in which the victim of the identity theft resides.[6]

The victim in this case, Ganek, Wright & Dobkin, is located in DeKalb County. Thus, even though many of the stolen checks were negotiated outside of DeKalb County, the trial court properly found that the evidence presented at trial was sufficient to prove venue in DeKalb County beyond a reasonable doubt for all 20 counts of identity fraud because the McKenzies accessed the financial information of a victim residing in DeKalb County.

3. The McKenzies contend the continuing witness rule was violated when the jury was allowed, over objection, to receive and consider during deliberations a "timeline" of the cell phone activity between Belinda and Emma McKenzie around the time the checks were being cashed. These summaries show that cell phone activity between Belinda and Emma McKenzie spiked on the dates and during the times the checks were cashed. On days when a check was cashed, there were as many as seventeen calls between the two women, with a flurry of calls right around the time of the check cashing. On days when no checks were cashed, however, the women often did not call each other at all. According to the McKenzies, these exhibits should not have been permitted to go out with the jury.

However, the McKenzies have failed to provide this Court with a citation to the record showing that they objected to the admission of these documents based on the continuing witness rule, and the trial court noted in its order denying the McKenzies' motion for new trial that "neither Defendant made a specific continuing witness objec-

---

[5] OCGA § 16-9-125.
[6] See *State v. Mayze*, 280 Ga. 5, 10 (622 SE2d 836) (2005).

tion." Since the McKenzies did not make a continuing witness objection either when the evidence was introduced at trial or when it was included in the exhibits sent to the jury room, this claim of error has not been preserved for appeal.[7]

Moreover, the continuing witness rule does not apply to demonstrative evidence designed to illustrate testimony given by witnesses.[8] Here, the documents complained of were designed by an investigator at the DeKalb County District Attorney's office based on other admitted exhibits (the McKenzies' cell phone records and the dates and times the checks were cashed). The documents were admitted at trial and served only to summarize the other admissible evidence. Therefore, no violation of the continuing witness rule occurred. And, even if a violation did occur in this case, harm as well as error must be shown to warrant reversal.[9] Given the facts that the evidence contained in the summaries was also brought out during the trial and the evidence of guilt was overwhelming, it is highly probable that there was no harm and the jury's view of these summary exhibits did not contribute to the verdict.[10]

*Judgments affirmed. Ellington and Mikell, JJ., concur.*

DECIDED SEPTEMBER 28, 2009 — RECONSIDERATIONS
DENIED OCTOBER 7, 2009 AND OCTOBER 15, 2009 — 

*Carl P. Greenberg*, for appellant (case no. A09A1991).
*Jimmonique R. S. Rodgers*, for appellant (case no. A09A2093).
*Gwendolyn Keyes Fleming, District Attorney, Daniel J. Quinn, Assistant District Attorney*, for appellee.

---

[7] See *Flournoy v. State*, 266 Ga. 618, 618-619 (2) (469 SE2d 195) (1996).

[8] See *Moss v. State*, 274 Ga. 740, 741-742 (2) (559 SE2d 433) (2002) (permitting the jury to have a mannequin head with a wooden dowel showing the trajectory of a bullet to illustrate the testimony of the medical examiner); *Rasch v. State*, 260 Ga. App. 379, 385-386 (2) (579 SE2d 817) (2003) (permitting the jury to have charts prepared by a forensic auditor because they were demonstrative and merely illustrated the auditor's testimony).

[9] See *Hinton v. State*, 233 Ga. App. 213, 214 (1) (504 SE2d 49) (1998).

[10] See *Kent v. State*, 245 Ga. App. 531, 533 (3) (538 SE2d 185) (2000).