311 Ga. 506
FINAL COPY

S21A0220.  MOORE v. THE STATE.
S21A0221.  MILBOURNE v. THE STATE.


BOGGS, Justice.

Simeon Gashon Moore and Walter Vernell Milbourne challenge their 2016 convictions for malice murder and other crimes in connection with the shooting of Jamie Milton and the shooting death of Milton's girlfriend, Jamie Moore ("Jamie"). Moore contends that the evidence presented at trial was legally insufficient to show that he shared responsibility for Jamie's death and that he was denied the effective assistance of counsel due to a conflict of interest. Milbourne contends that the trial court violated the continuing witness rule by sending a PowerPoint presentation created by the lead detective that summarized the admitted cell phone evidence out with the jury during deliberations and erred in granting a request by the media to film closing arguments over his objection. Milbourne also contends that his motion for new trial counsel was

constitutionally ineffective. For the reasons that follow, we affirm both cases.[1]

1. On the afternoon of November 12, 2014, Kevin Robinson arranged to meet Milton to buy a quarter-pound of marijuana with money supplied by Milbourne. Milbourne's best friend, Moore, drove Milbourne and Robinson to the meeting in a red Toyota Camry with after-market rims and a paper license tag. They parked at a gas

---

[1] The crimes occurred on November 12, 2014. On January 30, 2015, a Cobb County grand jury indicted Moore, Milbourne, and Kevin Nathaniel Robinson for malice murder and other crimes. On July 1, 2016, Moore, Milbourne, and Robinson were re-indicted for malice murder, five counts of felony murder, two counts of aggravated assault with a deadly weapon, first degree burglary, armed robbery, possession of more than an ounce of marijuana, and one count for each defendant of possession of a firearm during the commission of a felony. Moore also was charged with fleeing or attempting to elude a police officer. Robinson pled guilty to reduced charges and agreed to testify for the State. At a two-week trial in August 2016, the jury found Moore and Milbourne guilty of all charges. The trial court sentenced Moore and Milbourne as recidivists to serve life in prison without the possibility of parole for malice murder, consecutive terms of five years each for possession of a firearm during the commission of a felony, and concurrent terms of years for one count of aggravated assault, first degree burglary, armed robbery, and possession of more than an ounce of marijuana; the court also sentenced Moore to a concurrent term of five years for fleeing or attempting to elude a police officer. The felony murder counts were vacated by operation of law, and the other aggravated assault count merged. Moore and Milbourne filed timely motions for new trial, which they later amended with new counsel. After a hearing, on October 29, 2019, the trial court denied the motions. Moore and Milbourne filed timely notices of appeal, and the cases were docketed in this Court to the term beginning in December 2020 and submitted for a decision on the briefs.

station across the street from the fast-food restaurant where the drug buy was to take place. Milton was already parked at the restaurant in a blue Buick LeSabre, and Robinson walked across the street and got into the front passenger seat of the LeSabre. The transaction fell through, however, and Robinson got out of the LeSabre, walked back across the street, and got into the Camry with Moore and Milbourne. Robinson left one of his cell phones in the LeSabre.

Milton drove to the nearby apartment complex where he and Jamie were living temporarily with friends in Apartment 1707. Milton backed into a parking space by the 1800 building, and as he got out of the car, he noticed Robinson's cell phone on the seat. Milton picked up Robinson's cell phone, threw it somewhere, and went upstairs to Apartment 1707, where Jamie was cooking and talking on the phone.

Moore drove Milbourne and Robinson to Milton's apartment complex, where they located the LeSabre and parked near it. They did not know where Milton lived, so Milbourne and Robinson started

3

knocking on doors, asking if "a guy with dreads" lived there. When they got to Apartment 1707, Milton was in the bathroom, and Jamie spoke to Milbourne and Robinson through the door. A few minutes later, Milbourne and Robinson returned to Apartment 1707 and knocked again. This time, Milton opened the door, and Robinson asked if he could look in the LeSabre for his cell phone. Milton grabbed the car keys, closed the door behind him, and walked downstairs with Milbourne and Robinson.

Milton sat in the driver's seat of the LeSabre, and Robinson got into the front passenger seat and began looking for his cell phone. When Milton put the key in the ignition, Moore and Milbourne approached the LeSabre with guns drawn, and Milbourne demanded to know where Milton's marijuana and money were. Milton replied, "I don't know. I ain't got it . . . ." Milbourne said that he was "fixing to go upstairs and get that b**ch," referring to Jamie, and ran back up the stairs, telling Moore to keep his gun on Milton, which Moore did as Robinson ran up the stairs after Milbourne. Seconds later, Milton opened the driver-side door of the LeSabre,

and Moore opened fire into the car but only grazed Milton, who lay still across the front seat and played dead.

Meanwhile, up in Apartment 1707, Milbourne fought with Jamie, threatened her, and shot her in the head, killing her. Milbourne took marijuana, money, and clothing from the apartment and brought them downstairs to the Camry. When Milbourne saw Milton peeking over the dashboard of the LeSabre, he fired through the windshield at Milton but missed. Moore, Milbourne, and Robinson then got into the Camry, and Milton scrambled out the passenger-side door of the LeSabre. As Moore sped off, Milton ran to the leasing office, where a leasing consultant called 911, and Milton provided a description of the Camry and of Moore, Milbourne, and Robinson.

Within minutes, police officers driving toward the apartment complex spotted the Camry, and Moore led them on a high-speed chase over the Interstate and surface streets, which ended when the Camry hit a van and flipped over. Moore, Milbourne, and Robinson fled on foot but were quickly apprehended. Milbourne threw

multiple baggies of marijuana on the ground as he ran from the police; he had more than $1,000 in cash on his person when he was taken into custody. When the police caught up to Robinson, he pulled a bag of marijuana out of his pocket. The gun that Moore used to shoot at Milton was recovered at the crash site, along with the clothing that Milbourne took from the apartment.

*Case No. S21A0220*

2.    Moore contends that the evidence presented at trial was legally insufficient to prove that he shared responsibility for Jamie's death.

> When we consider the sufficiency of the evidence as a matter of federal due process, our review is limited to whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

*Frazier v. State*, 308 Ga. 450, 452 (841 SE2d 692) (2020) (citation and punctuation omitted). We put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the

6

evidence, leaving the resolution of such matters to the discretion of the jury. See id. at 452-453.

At trial, Moore's defense strategy was to concede that he drove Milbourne and Robinson to meet Milton to buy a quarter-pound of marijuana and to Milton's apartment complex afterward, and that he committed felony fleeing or attempting to elude a police officer after Jamie was shot, but to deny any responsibility for her death on the theory that he did not shoot her and never entered the apartment where she was killed. But to convict Moore of murdering Jamie, "the State was not required to prove that he personally fired the shot that killed [her], only that [he] was a party to the crime[ ], meaning that he intentionally aided or abetted in the commission of the crime[ ]," Frazier, 308 Ga. at 453, or that he conspired with Milbourne to rob drug dealer Milton at gunpoint and Jamie's death was a reasonably foreseeable consequence of the scheme, see *McLeod v. State*, 297 Ga. 99, 102-103 (772 SE2d 641) (2015). See also OCGA § 16-2-20 (b) (defining "parties to a crime"); *State v. Jackson*, 287 Ga. 646, 652-653 (697 SE2d 757) (2010) (noting "the dangerous

and violent nature of armed robbery and drug dealing"); *Everritt v. State*, 277 Ga. 457, 459-460 (588 SE2d 691) (2003) (discussing legal responsibility of a criminal defendant for "*natural* and *probable*" or "reasonably foreseeable" collateral acts of a co-conspirator (emphasis in original)).

The evidence presented at trial, when properly viewed in the light most favorable to the verdicts, showed that Milbourne and Moore simultaneously approached Milton with guns drawn when Milton put the key in the ignition of the LeSabre, and Milbourne demanded to know where Milton's marijuana and money were. When Milton refused to cooperate, Milbourne announced that he was "fixing to go upstairs and get that b**ch," referring to Jamie. At Milbourne's direction, Moore held Milton at gunpoint in the parking lot as Milbourne ran up the stairs. When Milton opened the driver-side door of the LeSabre to get away, Moore opened fire into the car, grazing Milton. Milbourne, after shooting Jamie, brought marijuana, money, and clothing downstairs from the apartment, put them in the Camry, and shot at Milton through the windshield of

8

the LeSabre. Moore then got into the Camry with Milbourne and Robinson and sped off, leading the police on a dangerous high-speed chase over the Interstate and surface streets that ended only when the Camry hit a van and flipped over.

A rational jury could infer from Moore's actions before, during, and after the shooting of Jamie that Moore shared a common criminal intent with Milbourne. See *Frazier*, 308 Ga. at 453 ("'While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense.'" (citation omitted)). A rational jury also could infer from this evidence that Milbourne and Moore conspired to rob Milton at gunpoint and that the murder of Jamie (or anyone else standing in the way of the armed robbery) was a reasonably foreseeable consequence of the conspiracy. See *Hicks v. State*, 295 Ga. 268, 273-274 (759 SE2d 509) (2014). Accordingly, the evidence presented at trial was legally sufficient to support Moore's conviction for the malice murder of Jamie.

9

3. Moore also contends that he was denied the effective assistance of counsel at trial due to a conflict of interest. We disagree.

On the first day of the second week of trial, during an afternoon break before Robinson testified, Jill Stahlman, Moore's trial counsel, was reviewing Robinson's prior convictions and probation revocations in preparation for cross-examination when she noticed her signature at the bottom of the second page of an April 18, 2011 consent probation revocation order. Stahlman brought the issue to the trial court's attention and told the court that she had no independent recollection of representing Robinson, that she did not recognize him, and that she did not have any confidential information relating to the prior representation that could be used to Robinson's detriment. Robinson consulted with an attorney, Sara Becker, and then agreed to waive any potential conflict of interest and signed a written waiver. Moore consulted with Stahlman and also agreed to waive any potential conflict, but as Stahlman was preparing a written waiver for Moore to sign, she became concerned

10

that Moore should have the opportunity to consult with independent counsel.

The court asked Stahlman if she would "let up" on Robinson or "take it easy on him" during cross-examination because she previously represented him, and Stahlman said no. The court then asked Moore if he wanted to talk to another attorney before signing a waiver, and when Moore said that he was unsure, the court called a recess and arranged for Moore to speak with attorney Maddox Kilgore. After consulting with Kilgore, Moore decided not to waive any potential conflict of interest. Stahlman told the court that in light of Moore's decision not to waive the conflict, she was not comfortable going forward with the representation. After calling another recess, the court found that there was no real conflict of interest and denied Stahlman's motion to withdraw from representing Moore.

Robinson testified the next morning and was cross-examined by Stahlman and counsel for Milbourne. The court then sent the jury to lunch and asked, "Ms. Stahlman, did you ask every question you

11

would have ordinarily asked Mr. [Robinson] or did you let up on him?" Stahlman replied, "No, sir. I did not let up on him."

To obtain reversal of a conviction based on a claim that trial counsel's assistance was rendered ineffective by a conflict of interest, a defendant must show that his counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his counsel's performance. See *Strickland v. Washington*, 466 U.S. 668, 692 (104 SCt 2052, 80 LE2d 674) (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (100 SCt 1708, 64 LE2d 333) (1980)). See also *Mickens v. Taylor*, 535 U.S. 162, 174 (122 SCt 1237, 152 LE2d 291) (2002) (holding that in cases where there is a conflict rooted in counsel's obligations to a former client, it is "at least necessary, to void the conviction, for [the defendant] to establish that the conflict of interest adversely affected his counsel's performance"). Moore failed to make the required showing.

The trial court credited Stahlman's representations that she did not recognize Robinson, had no recollection of representing him until she saw her signature on the consent probation revocation

order from five years earlier, did not receive any confidential information during her representation of him that would affect her representation of Moore, and did not "let up on" Robinson during cross-examination. Moore does not even speculate about what Stahlman might have done differently in this case had she not previously represented Robinson in an unrelated matter, much less point to anything in the record showing that Stahlman's representation of him was adversely affected by her prior representation of Robinson. Accordingly, Moore's claim that he was denied the effective assistance of counsel at trial due to a conflict of interest lacks merit. See *Hill v. State*, 269 Ga. 23, 24-25 (494 SE2d 661) (1998) (rejecting claim of ineffective assistance of trial counsel based on counsel's prior representation of prosecution witness in an unrelated criminal matter where the defendant failed to show an adverse effect on the representation).

### *Case No. S21A0221*

4. Milbourne contends that the trial court violated the continuing witness rule by sending out with the jury during

13

deliberations a PowerPoint presentation that summarized the admitted cell phone evidence. However, the continuing witness rule is directed at written testimony that is heard by the jury when read from the witness stand. See *Keller v. State*, 308 Ga. 492, 505-506 (842 SE2d 22) (2020). The rule is based on the principle that it is unfair and places undue emphasis on written testimony that has been read to the jury for the writing to be sent out with the jury to be read again during deliberations whereas oral testimony is received by the jury only once. See id. at 506. We previously have held that a summary of admitted cell phone records may be sent out with the jury during deliberations without violating the continuing witness rule. See *Wilkins v. State*, 291 Ga. 483, 487-488 (731 SE2d 346) (2012). See also *Rainwater v. State*, 300 Ga. 800, 802 n.3 (797 SE2d 889) (2017) ("[T]he continuing witness rule itself was unaffected by the enactment of the new Evidence Code."). And contrary to Milbourne's suggestion, the fact that the lead detective prepared the PowerPoint summary here has no bearing on whether the continuing witness rule was violated. See *Wilkins*, 291 Ga. at

14

487 (referring to the "State-created summary"). See also *McKenzie v. State*, 300 Ga. App. 469, 473 (685 SE2d 333) (2009) (holding that the continuing witness rule did not apply to a timeline of the defendants' cell phone activity created by an investigator for the district attorney's office). Accordingly, this claim fails.

5. Citing former Uniform Superior Court Rule 22 (P),[2] Milbourne contends that the trial court erred in granting a request by the media to film closing arguments over his objection, because the record does not affirmatively show that the court considered the factors set out in OCGA § 15-1-10.1 (b).[3] However, Milbourne cites

---

[2] Milbourne's trial took place in August 2016. At the time, former Uniform Superior Court Rule 22 (P) said: "A request for installation and use of electronic recording, transmission, videotaping or motion picture or still photography of any judicial proceeding shall be evaluated pursuant to the standards set forth in OCGA § 15-1-10.1."

[3] OCGA § 15-1-10.1, which has not been amended since Milbourne's trial, says:

> (a) It is declared to be the purpose and intent of the General Assembly that certain standards be considered by the courts in determining whether to grant requests for the televising, videotaping, or motion picture filming of judicial proceedings. Such standards are intended to provide an evaluation of the impact on the public interest and the rights of the parties in open judicial proceedings, the impact upon the integrity and dignity of the court, and whether the proposed activity would contribute to the enhancement of or

15

detract from the ends of justice.

(b) In considering a request for the televising, videotaping, or motion picture filming of judicial proceedings, the court shall consider the following factors in determining whether to grant such request:

(1) The nature of the particular proceeding at issue;

(2) The consent or objection of the parties or witnesses whose testimony will be presented in the proceedings;

(3) Whether the proposed coverage will promote increased public access to the courts and openness of judicial proceedings;

(4) The impact upon the integrity and dignity of the court;

(5) The impact upon the administration of the court;

(6) The impact upon due process and the truth finding function of the judicial proceeding;

(7) Whether the proposed coverage would contribute to the enhancement of or detract from the ends of justice;

(8) Any special circumstances of the parties, victims, witnesses, or other participants such as the need to protect children or factors involving the safety of participants in the judicial proceeding; and

(9) Any other factors which the court may determine to be important under the circumstances of the case.

(c) The court may hear from the parties, witnesses, or other interested persons and from the person or entity requesting coverage during the court's consideration of the factors set forth in this Code section.

(d) This Code section shall not apply to the use of electronic or photographic means for the presentation of evidence or the perpetuation of a record.

(e) The court in its discretion may grant requests made under this Code section for all or portions of judicial proceedings.

no authority for the proposition that a trial court must state on the record its reasons for granting a Rule 22 request. Moreover, we generally presume that a trial court made the findings necessary to support its ruling, unless the record shows otherwise. See, e.g., *Williams v. State*, 306 Ga. 674, 677 (832 SE2d 843) (2019). Accordingly, this claim lacks merit.

6. Finally, Milbourne contends that his motion for new trial counsel was constitutionally ineffective. Specifically, Milbourne points to three alleged instances of deficient performance by his trial counsel that he says were prejudicial to his defense, see *Strickland*, 466 U.S. at 687, and he asserts that his motion for new trial counsel was constitutionally ineffective in failing to pursue an ineffective assistance of trial counsel claim at the motion for new trial stage.[4]

In Georgia, ineffectiveness claims must be raised and pursued at the "'earliest practicable moment,'" which for a claim of ineffective

---

[4] Attorney Kevin Rodgers represented Milbourne at trial and filed a timely motion for new trial on his behalf. Milbourne's motion for new trial counsel, Rebekah Shelnutt, filed two amended new trial motions, appeared at the motion for new trial hearing, and filed a timely notice of appeal. Jennifer Adams was then appointed to represent Milbourne in this appeal.

assistance of trial counsel is at the motion for new trial stage if the defendant "'is no longer represented by the attorney who represented him at trial.'" *Elkins v. State*, 306 Ga. 351, 361 (830 SE2d 217) (2019) (citations omitted). Milbourne had new counsel at the motion for new trial stage, but she did not pursue an ineffective assistance of trial counsel claim on his behalf. Indeed, at the motion for new trial hearing, she told the court that Milbourne's trial counsel was "very thorough." Thus, Milbourne waived any claim of ineffective assistance of trial counsel. See id. at 361.

We do not allow a defendant to resuscitate a waived claim of trial counsel ineffectiveness on appeal by recasting the claim as one of ineffective assistance of motion for new trial counsel, because allowing "'such bootstrapping would eviscerate the fundamental rule that ineffectiveness claims must be raised at the earliest practicable moment and would promote serial appellate proceedings.'" *Elkins*, 306 Ga. at 362 (citation omitted). Because Milbourne's claim of ineffective assistance of motion for new trial counsel is "merely a camouflaged claim of ineffectiveness by trial

18

counsel," id., it is procedurally barred, see *Robinson v. State*, 306 Ga. 614, 616-617 (832 SE2d 411) (2019). If Milbourne wishes to pursue a claim that his motion for new trial counsel was ineffective, he must do so through a petition for a writ of habeas corpus. See *Elkins*, 306 Ga. at 362.

*Judgments affirmed. All the Justices concur.*

Decided May 17, 2021.

Murder. Cobb Superior Court. Before Judge Leonard.

*Strickland Webster, Sydney R. Strickland*, for appellant (case no. S21A0220).

*Jennifer S. Adams, Rebekah R. Shelnutt*, for appellant (case no. S21A0221).

*Joyette M. Holmes, District Attorney, Linda J. Dunikoski, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.