314 Ga. 746
FINAL COPY

S22A0754.  WATTS v. THE STATE.

Boggs, Chief Justice.

Appellant Ronregus Watts challenges his 2008 convictions for felony murder and other crimes in connection with the shooting death of Thomas Vinson.[1] Appellant contends that the evidence

---

[1] Vinson was killed on December 22, 2006. On March 27, 2007, a Fulton County grand jury indicted Appellant, along with Jarmarvis Dixon, for malice murder, three counts of felony murder, armed robbery, hijacking a motor vehicle, burglary, two counts of aggravated assault with a deadly weapon, possession of a firearm during the commission of a felony, financial transaction card theft, and two counts of financial transaction card fraud. Dixon was tried the week before Appellant, and we later affirmed his convictions. See *Dixon v. State*, 294 Ga. 40 (751 SE2d 69) (2013). Appellant pled guilty to the two counts of financial transaction card fraud, and at a trial from April 14 to 21, 2008, the jury acquitted him of malice murder but found him guilty of the remaining charges. The trial court sentenced Appellant to serve life in prison for felony murder based on aggravated assault for the shooting of Vinson, consecutive terms of 20 years each for hijacking a motor vehicle and aggravated assault for the pistol-whipping of Vinson, a consecutive term of five years for possession of a firearm during the commission of a felony, and a total of three years consecutive for the three financial transaction card convictions. The other two felony murder counts were vacated by operation of law, and the court merged the remaining counts for purposes of sentencing. The State did not file a cross-appeal challenging the court's merger rulings, and we decline to exercise our discretion to review them on our own initiative. See *Hood v. State*, 303 Ga. 420, 424-425 (811 SE2d 392) (2018). On May 12, 2008, Appellant filed a motion for new trial, which he amended with new counsel more than a decade later on November 15, 2018. On May 29, 2019, the trial court denied the motion.

presented at trial was legally insufficient to support his convictions, and that the trial court erred in denying his motion to suppress his statement to the police and physical and testimonial evidence obtained as a result of his statement. As explained below, when properly viewed in the light most favorable to the jury's verdicts, the evidence was sufficient to support Appellant's convictions, and the trial court did not err in denying his motion to suppress. Accordingly, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In mid-October 2006, Appellant began dating Tiarra Neely, and two weeks later, he moved in with her and her two young children at her townhouse in the city of East Point. Neely's cousin, Jarmarvis Dixon, spent three or four nights a week at Tiarra's townhouse, sleeping on the sofa in the living room, and the rest of the time he slept at the home of Tiarra's younger sister, Shamika Neely.

Appellant filed a timely notice of appeal, which he later amended, and the case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

Sometime after dark on December 22, 2006, Appellant and Dixon left Tiarra's townhouse wearing dark sweatshirts and went to the city of College Park, where they were walking along Hardin Avenue when Susan Mercer pulled up to her house and put on her blinker to indicate that she was turning into the driveway. Appellant and Dixon, who had their hoods up, "took their time" crossing Mercer's driveway and then turned and looked at her in a way that gave her an uneasy feeling. Mercer pulled into her driveway, turned off her SUV, and gathered her things, but before getting out, she looked in the rearview mirror. Mercer saw either Appellant or Dixon standing behind her SUV with his legs apart, his hands in his sweatshirt, and a disturbing look on his face.

Mercer, whose hands were shaking, put the keys back in the ignition, started the SUV, backed out quickly, and drove off the way that she came. Mercer used her cell phone to call her husband, who told her to go back to the house and that he would have a neighbor, Ken Allen, meet her there. Mercer drove back home, parked in her driveway, and waited for Allen, who came over on foot and escorted

her into the house. Before going inside, Mercer looked down the street, saw Appellant and Dixon walking in the direction of the rental house that Vinson and his wife owned, and said, "There they go."

Allen told Mercer that he was going to get in his truck and go check out the two men walking down the street who had frightened her. Allen drove by Vinson's rental house, where he saw Appellant and Dixon leaning against the porch railing. Vinson's truck was in the carport, but Allen did not see Vinson. Allen drove four or five houses down, turned left, went around the block, and drove back up the street to the rental house. By that point, Vinson's truck was parked on the street, and either Appellant or Dixon was sitting in the driver's seat. Allen heard a loud noise from inside the rental house that sounded "like a two-by-four hitting against the cement" and saw either Appellant or Dixon run out of the house and across the carport and jump in the open passenger-side door of Vinson's truck. Appellant and Dixon then sped away in Vinson's truck.

Allen followed the truck for a brief time before calling 911 and

reporting it as a stolen vehicle. Allen then returned to the rental house, where he noticed blood in the carport leading up to the door. Allen went inside the house, where he found Vinson lying dead on the laundry room floor from a close-range gunshot wound to the face. Allen called 911 again, and the police soon arrived. In addition to the gunshot wound, Vinson had blunt-force injuries to his ear and the back of his head.

Appellant and Dixon abandoned Vinson's truck at an apartment complex about three miles away from the rental house. Surveillance video from a nearby Kroger recorded less than an hour after the shooting showed Appellant and Dixon using one of Vinson's credit cards to buy a carton of Newport cigarettes.

A few days after the shooting, Dixon told his cousin Shamika that he "got some money" from "some dude" and produced Vinson's obituary from his pocket. Dixon said that he and Appellant killed Vinson, and he showed her a credit card that had Vinson's name on it.

On the day after Christmas, Appellant and Dixon returned to the same Kroger where they had been captured on video using one of Vinson's credit cards, and they were again captured on video using one of Vinson's credit cards to make a purchase. The police, who had put an alert on Vinson's credit cards, responded to the Kroger while Appellant and Dixon were still there and took them to a police station, where they were interviewed that evening after being advised of their *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). The police interviews of Appellant and Dixon were video recorded, but the recordings were not introduced into evidence at Appellant's trial.

When Appellant's interview ended in the early morning hours of the day after the arrest, he led the police to Tiarra's townhouse, and she signed a consent-to-search form. Downstairs, the police recovered two of Vinson's checkbooks, a glove turned inside-out that appeared to match a glove found at Vinson's rental house, and a pair of blue jeans with blood splatter containing Vinson's DNA. Upstairs,

6

the police found a box of Newport cigarettes in a closet in the bedroom where Appellant and Tiarra slept.

On the day after the search of the townhouse, a man who worked at a car wash on the same street as the Kroger where Appellant and Dixon were detained found Vinson's wallet in a trash can and turned it over to the police. The police later recovered Vinson's cell phone from a sewer on the same street.

2.    Appellant contends that the evidence was legally insufficient to support the jury's guilty verdicts.

> When we consider the sufficiency of the evidence as a matter of federal due process, our review is limited to whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

*Moore v. State*, 311 Ga. 506, 508 (858 SE2d 676) (2021) (citation and punctuation omitted). We put aside any questions about conflicting evidence, the credibility of the witnesses, or the weight of the evidence, leaving the resolution of such matters to the discretion of

the jury. See id. at 509. Moreover, "[w]hen we consider sufficiency, we consider *all* the evidence admitted at trial, regardless of whether the trial court erred in admitting some of that evidence." *Davenport v. State*, 309 Ga. 385, 397 (846 SE2d 83) (2020) (emphasis in original). See also *McDaniel v. Brown*, 558 U.S. 120, 131 (130 SCt 665, 175 LE2d 582) (2010).

When properly viewed in the light most favorable to the jury's verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt, either as a principal or as a party to the crimes. See *Jackson*, 443 U.S. at 319. See also OCGA § 16-2-20 (defining parties to a crime); *Dickey v. State*, 313 Ga. 593, 597 (872 SE2d 297) (2022) ("[T]he jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes.").

3.    Appellant also contends that the trial court erred in denying his motion to suppress his statement to the police and the

evidence to which his statement led, namely, the physical evidence recovered from Tiarra's townhouse and Tiarra and Shamika Neely's testimony at trial. Appellant cites former OCGA § 24-3-50, which applied to his 2008 trial and said, with emphasis added: "To make a confession admissible, it must have been made voluntarily, without being induced by another by the *slightest hope of benefit* or remotest fear of injury."[2] Appellant claims that the police induced his statement by threatening him with the death penalty and impliedly promising him that if he confessed, the death penalty would be taken off the table, which he argues constituted an improper hope of benefit requiring the exclusion not only of his statement, but all the evidence to which his statement led under the "fruit of the poisonous tree" doctrine. See generally *Wong Sun v. United States*, 371 U.S. 471, 484-488 (83 SCt 407, 9 LE2d 441) (1963) (discussing the "fruits"

---

[2] Former OCGA § 24-3-50 and its companion provision, former OCGA § 24-3-51, were carried forward without substantive change into Georgia's new Evidence Code, which took effect on January 1, 2013. See OCGA §§ 24-8-824 and 24-8-825. See also *Brown v. State*, 290 Ga. 865, 868-869 & n.1 (725 SE2d 320) (2012) (discussing former OCGA §§ 24-3-50 and 24-3-51).

9

extension of the exclusionary rule). This claim fails for at least two reasons.[3]

First, we have repeatedly held that informing a murder suspect that "the crime is potentially punishable by death is simply an explanation of the seriousness of his situation" that does not render his statement inadmissible under former OCGA § 24-3-50. *Funes v. State,* 289 Ga. 793, 797 (716 SE2d 183) (2011) (citation and punctuation omitted). The record shows that nothing more than that occurred here. Second, the fruit of the poisonous tree doctrine does not apply to violations of former OCGA § 24-3-50. See *State v. Chulpayev*, 296 Ga. 764, 783-784 (770 SE2d 808) (2015). Thus, even if Appellant's statement to the police had been induced by an improper hope of benefit — and the record shows that it was not — the trial court still would have acted properly in denying his motion to suppress with regard to the physical and testimonial evidence that he claims was obtained as a result of his statement.

---

[3] As noted above, Appellant's video-recorded statement to the police was not introduced into evidence at his trial. Thus, any error in denying his motion to suppress as to the video-recorded statement itself was harmless.

Accordingly, the trial court did not err in denying Appellant's motion to suppress on the basis of former OCGA § 24-3-50.

*Judgment affirmed. All the Justices concur.*

Decided October 4, 2022.

Murder. Fulton Superior Court. Before Judge Schwall.

*J. Wesley Bryant*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.