**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 3, 2026

S26A0185. GIBSON v. HEAD, WARDEN.

LaGrua, Justice.

Exzavious Gibson appeals the denial of his second petition for writ of habeas corpus, which stemmed from his 1990 convictions for murder and armed robbery. On appeal, Gibson contends that, because his trial counsel labored under an obvious and impermissible conflict by representing Gibson while also working as a Special Assistant Attorney General, Gibson was denied the right to effective assistance of counsel, and his convictions should be vacated. For the reasons that follow, we affirm the habeas court's denial of Gibson's petition because the record supports the habeas court's conclusion that Gibson failed to show that an actual conflict of interest existed that significantly and adversely affected his trial

counsel's performance.[1] See *Cuyler v. Sullivan,* 446 US 335, 348–50 (1980).

1. *The underlying proceedings.*

(a) *Trial and direct appeal.* In 1990, a Dodge County jury found Gibson guilty of murder and armed robbery arising out of the February 1990 stabbing death of Doug Coley, who operated a grocery store in Dodge County. See *Gibson v. State,* 261 Ga. 313, 313 (1991). Gibson, who was 17 years old at the time of the crimes, entered the grocery store and "killed the owner with a knife by stabbing and slashing him thirty-nine times." *Gibson v. Turpin,* 270 Ga. 855, 855 (1999). Gibson "attacked the victim with such force that the blade of the knife broke in the victim's neck vertebrae," but "he continued stabbing with the handle and blade remnant." Id. Following Gibson's arrest, "Gibson confessed that he robbed and murdered the victim because he needed money for drugs" and because the victim had "chastised" him earlier in the day for "using

---

[1] This case was docketed in this Court to the term beginning in December 2025 and was orally argued on January 20, 2026.

profanity." Id. at 855–56. "Gibson told the police that he had no regrets about what he had done." Id. at 856.

Following Gibson's convictions, the trial court sentenced him to death for murder and to life in prison for armed robbery. See *Gibson,* 261 Ga. at 313. Gibson was represented at trial by Dennis Mullis, a public defender, who also filed a direct appeal on Gibson's behalf.[2] In 1991, this Court affirmed Gibson's convictions and sentences. See id.

---

[2] In his direct appeal, Gibson argued that his convictions should be reversed based on the following contentions: (1) the trial court erred by denying his motion for change of venue because he could not get a fair trial in Dodge County; (2) the trial court abused its discretion by denying Gibson's motion to compel the State to submit its requests to charge at least 24 hours before trial; (3) the trial court erred by refusing to close the pretrial proceedings to the media; (4) the trial court erred by denying Gibson's motion to suppress bloody money, bloody clothes, and the victim's wallet seized from Gibson's bedroom because there was no evidence that the arresting officer was authorized to enter the bedroom; (5) the attorney general's response to Gibson's attempt to subpoena information from witnesses employed by the state crime laboratory denied Gibson the effective assistance of counsel because Gibson was forced to withdraw those subpoenas after the attorney general used "bullyboy" tactics by seeking to quash the subpoenas, to assess costs, and to hold defense counsel in contempt of court for filing the subpoenas; (6) the trial court abused its discretion in denying Gibson's motion for mistrial after the arresting officer offered testimony based on hearsay; (7) the trial court erred by admitting pre-autopsy photographs of the victim's body; (8) the trial court abused its discretion in denying Gibson's motion for mistrial after the State asked Gibson about how long the effects of crack cocaine lasted during the sentencing phase

(b) *Habeas proceedings.* After this Court affirmed Gibson's convictions and sentences on appeal, Gibson filed his first petition for habeas corpus in the Superior Court of Butts County (the "habeas court") on December 20, 1995, "asserting ineffective assistance of counsel, prosecutorial misconduct, and other claims." *Gibson,* 270 Ga. at 855. After an evidentiary hearing in which Gibson appeared pro se, the habeas court denied Gibson's request for relief on March 11, 1997, and Gibson filed an application for a certificate of probable cause to appeal to this Court, which the Court denied. See id.

In 2000, Gibson filed a second petition for habeas corpus, alleging, among other things, that Mullis—his trial and appellate counsel—had labored under a conflict of interest because, at the time Mullis represented Gibson as a public defender, Mullis was also working as a Special Assistant Attorney General representing the

---

of the trial; (9) the evidence was insufficient to support the verdicts in this case; and (10) the trial court's jury instructions shifted the burden onto Gibson to justify a life sentence. See *Gibson,* 261 Ga. at 314–17. Seeing no merit to any of these contentions, this Court affirmed. See id.

4

Department of Transportation in highway condemnation matters—which Gibson discovered after the proceedings on his first habeas petition concluded. The habeas court dismissed Gibson's second habeas petition as successive under OCGA § 9-14-51, without conducting an evidentiary hearing, and Gibson timely filed an application for a certificate of probable cause to appeal to this Court. This Court denied Gibson's application as to all claims except his conflict-of-interest claim. As to that claim, we remanded the case for the habeas court to conduct an evidentiary hearing to determine if Gibson's conflict-of-interest claim, which was allegedly based on newly discovered information, was procedurally barred and, if not, if it had merit. See *Gibson v. Head*, 282 Ga. 156, 156 (2007) (recounting procedural history).

Following an evidentiary hearing in September 2003, the habeas court concluded that the conflict-of-interest claim was procedurally barred, and it made no ruling regarding the underlying merits of the claim. See *Gibson*, 282 Ga. at156. Thereafter, "[b]ased

5

on information in the trial record, this Court, on October 7, 2005, again remanded Gibson's case to the habeas court[3] to allow Gibson to challenge his death sentence based on a recent decision by the Supreme Court of the United States barring the execution of persons who were under 18 years old at the time of their crimes. See *Roper v. Simmons,* 543 US 551 (2005)." Id. On remand, the habeas court vacated Gibson's death sentence based on his age at the time of the murder, but denied his other requests for relief, again concluding that Gibson's conflict-of-interest claim was procedurally barred. See id. Gibson timely filed an application for a certificate of probable cause to appeal to this Court, which was granted. See id.

On appeal, the Court concluded that the habeas court erred in determining that Gibson's conflict-of-interest claim was procedurally barred because the habeas court had "failed to consider that Gibson was entitled to presume that his trial counsel was not laboring under an undisclosed conflict of interest," given that "trial

---

[3] It is not clear from the record how the case was procedurally back in this Court when we issued this remand.

counsel had an affirmative duty arising from several sources to disclose his potential conflict." *Gibson*, 282 Ga. at 157–58. The Court also noted that Gibson's conflict-of-interest claim "would not be barred by res judicata … if it were based on facts that were not reasonably available at the time of the habeas proceeding." Id. at 159. In 2007, the Court remanded the case for the habeas court to determine "the precise timing of Gibson's discovery of the previously undisclosed employment of his trial counsel as Special Assistant Attorney General." Id.

On November 28, 2023, the habeas court issued an order denying Gibson's second habeas petition.[4] In the order, the habeas court determined that Gibson's conflict-of-interest claim was not procedurally barred because "Gibson was entitled to presume that his counsel was not laboring under a conflict of interest," and Gibson

---

[4] Following this Court's remand to the habeas court in 2007, see *Gibson*, 282 Ga. at 159, Gibson's habeas case languished until 2023—for reasons that are not apparent in the record—when an attorney entered an appearance on Gibson's behalf and submitted a proposed order granting Gibson's second habeas petition.

"could not reasonably have raised this claim" in his first habeas petition. As to the merits of Gibson's conflict-of-interest claim, the habeas court considered the evidence presented at the 2003 hearing on Gibson's second habeas petition,[5] as well as the remainder of the record, and denied Gibson's claim on the merits, concluding that Gibson failed "to show that an actual conflict of interest existed which significantly and adversely affected his trial counsel's representation of Gibson," citing *Cuyler*, 446 US at 348–50, and *Hall v. Jackson,* 310 Ga. 714, 720 (2021).

In denying Gibson's habeas petition, the habeas court noted that, prior to trial, Mullis served subpoenas on several GBI analysts, seeking the production of information the analysts utilized in making their findings in this case. After the subpoenas were served, the Attorney General, representing the GBI, moved to quash the subpoenas on the basis that they were overly broad and sought

---

[5] Mullis testified at the September 9, 2003 hearing on Gibson's second habeas petition. Gibson also presented testimony from Mullis's June 27, 2003 deposition, as well as other evidence, at that hearing.

information that was not discoverable. The motion to quash also requested fees and sanctions against Mullis, including a request to hold Mullis in contempt for the allegedly frivolous nature of the subpoenas. When the motion to quash was argued at trial, Mullis withdrew the subpoenas, explaining that he did not want to be required to pay sanctions or be held in contempt, even though the trial court advised that was unlikely to occur.

The habeas court observed that Gibson's conflict-of-interest claim centered on Mullis's withdrawal of these subpoenas and an assertion that, when the Attorney General's Office filed a motion to quash on behalf of the GBI, Mullis withdrew the subpoenas because he did not want to jeopardize his position as a Special Assistant Attorney General, not because of any concern about being sanctioned or held in contempt. Gibson also claimed that Mullis's decision to withdraw the subpoenas demonstrated his conflicting loyalties and adversely affected his representation of Gibson. The

9

habeas court disagreed, concluding that the evidence in the record did not support Gibson's contentions.

To that end, the habeas court noted that Mullis testified at a 1996 hearing on Gibson's first habeas petition that his reason for withdrawing the subpoenas was strictly to avoid being sanctioned or held in contempt, not because of any conflict in his loyalties to Gibson. Mullis also raised the issue of the motion to quash in Gibson's direct appeal. See *Gibson,* 261 Ga. at 315–16. The habeas court also observed that Gibson produced no evidence during the habeas proceedings to enable the court to determine whether the subpoenas were valid or whether the subpoenaed documents would have contained valuable and relevant information that could have been used in defending Gibson at trial. Additionally, Gibson failed to present any evidence to demonstrate that Mullis withdrew the subpoenas based on a concern that his position or income as a Special Assistant Attorney General would be jeopardized, and as such, this contention was "merely speculative," particularly since

Mullis testified otherwise. The habeas court further concluded that, although Mullis was working as a Special Assistant Attorney General handling Department of Transportation cases when he was also representing Gibson, that was at most a "potential" conflict, and Gibson was still required to show "an adverse effect" on Mullis's representation by virtue of this conflict of interest, a showing Gibson failed to make. See *Cuyler*, 446 US at 348–50. For these reasons, the habeas court denied Gibson's request for habeas relief.

2. On appeal, Gibson contends that, because Mullis labored under an actual conflict of interest by representing Gibson while simultaneously serving as a Special Assistant Attorney General, Gibson was denied the effective assistance of counsel, and his convictions should be vacated. Specifically, Gibson claims that Mullis's employment as a Special Assistant Attorney General created a substantial risk that Mullis's interest in maintaining favor with the Attorney General would affect his simultaneous representation of Gibson, and when Mullis's relationship with the

Attorney General's office jeopardized his duty of loyalty to Gibson, Mullis prioritized the former by withdrawing the subpoenas he had served upon analysts from the GBI.

"A criminal defendant in Georgia is constitutionally entitled to the effective assistance of counsel during his trial, motion for new trial proceeding, and direct appeal. One component of the right to the effective assistance of counsel is the right to representation that is free of actual conflicts of interest." *Huitron v. Toby*, ___ Ga. ___ (2026), S25A0124, slip op. at 15–16 (Ga. Feb. 3, 2026) (citing *Hall*, 310 Ga. at 720 (quotation marks omitted)). In evaluating a criminal defendant's claim that "a conflict of interest worked a denial of the effective assistance of counsel," *Tolbert v. State*, 298 Ga. 147, 149–50 (2015), this Court has consistently applied the framework from *Cuyler* and required the defendant to show that "an actual conflict of interest adversely affected his lawyer's performance."[6] *Cuyler*, 446

---

[6] See e.g., *Huitron*, , S25A0124, slip op. at 15–16; *Dills v. Weaver*, __ Ga. __ (2026), S25A1367, slip op. at 17 (Ga. Jan. 5, 2026); *Adams v. State*, 317 Ga. 342, 351 (2023); *Hall*, 310 Ga. at 721; *Moore v. State*, 311 Ga. 506, 511 (2021); *Tolbert*, 298 Ga. at 149–50; *State v. Abernathy,* 289 Ga. 603, 604 (2011).

US at 348 (holding that, "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance"). See also *Adams v. State*, 317 Ga. 342, 351 (2023) (holding that "an actual conflict of interest means precisely a conflict *that affected counsel's performance* – as opposed to a mere theoretical division in loyalties" (cleaned up)).

When we review a habeas court's decision on a petitioner's conflict-of-interest claim, "we accept the court's factual findings unless they are clearly erroneous, but we apply the law to those facts de novo." *Dills v. Weaver*, ___ Ga. ___ (2026), S25A1367, slip op. at 17 (Ga. Jan. 5, 2026) (citing *Hall*, 310 Ga. at 719–20 (quotation marks omitted)). And, if there is evidence in the record to support the habeas court's factual findings, those "factual findings cannot be found to be clearly erroneous." Id. (citation omitted). "We must also yield to the judgment of the habeas court with respect to the credibility of witnesses who testified at the habeas proceedings." Id.

13

(citing *Humphrey v. Walker*, 294 Ga. 855, 860 (2014) (quotation marks omitted)). "A habeas court's determination regarding the presence or absence of an actual conflict of interest is a mixed question of fact and law, which this Court reviews de novo." Id. (cleaned up).

As reflected by the record and the findings of the habeas court, Mullis began working as a contract public defender in 1982. In 1986, Mullis was appointed as a Special Assistant Attorney General to periodically handle Department of Transportation cases. In 1990, Mullis was appointed to represent Gibson in his criminal trial, and after Gibson was convicted of murder and armed robbery, Mullis continued to represent Gibson in his direct appeal. During the criminal trial, the Attorney General appeared on behalf of several GBI analysts to whom subpoenas for records had been issued by Mullis. The Attorney General moved to quash the subpoenas and for other relief, and Mullis withdrew the subpoenas. At no point during Mullis's representation of Gibson did he disclose his appointment as

14

a Special Assistant Attorney General to Gibson and the trial court. See *Gibson*, 282 Ga. at 156–58.

Assuming without deciding that these circumstances created a potential conflict of interest on Mullis's part, we agree with the habeas court that Gibson failed to show that the conflict adversely affected Mullis's representation of Gibson. See *Huitron*, slip op. at 17 (concluding that, even if there was a potential conflict of interest, the defendant failed to show that the conflict "significantly or adversely" affected counsel's representation of the defendant). See also *Hall*, 310 Ga. at 720 (noting that, to "carry his burden of proving" that counsel "provided ineffective assistance because [counsel] had a conflict of interest," the defendant "must show that an actual conflict of interest significantly and adversely affected [counsel's] representation of [the defendant]" (cleaned up)).

A review of the record and our prior decisions in Gibson's cases support the habeas court's conclusions that, despite any potential conflict of interest, Mullis diligently represented Gibson at trial and

on direct appeal, and Mullis's separate work as a contract Special Assistant Attorney General for the Department of Transportation did not impede or impair his willingness or ability to fulfill his obligations to professionally and staunchly represent Gibson in his criminal case. In fact, when this Court considered and denied Gibson's application for a certificate of probable cause to appeal the denial of his first habeas petition in 1999, we concluded—in rejecting Gibson's ineffective assistance of counsel claim—that Mullis: (1) "met with Gibson many times before trial"; (2) "investigated Gibson's case" and "possible defenses"; (3) "filed several discovery motions, including a *Brady* motion"; (4) "successfully moved for an independent psychological evaluation"; (5) "filed numerous relevant pretrial motions," including motions to suppress and a motion for change of venue; (6) "interviewed key witnesses"; (7) "made timely objections at trial"; (8) "invoked Gibson's youth and his lack of a family while growing up" and "implored the jury to spare Gibson" during closing argument; and (9) "elected to present evidence in the

16

sentencing phase of Gibson's youth, his remorse, and his childhood without parents." *Gibson*, 270 Ga. at 863–66. And, while the better practice would certainly have been for Mullis to disclose his role as a Special Assistant Attorney General to Gibson and the trial court in compliance with OCGA § 45-15-30,[7] we cannot say—given the facts and circumstances presented in this case—that Mullis's failure

---

[7] In pertinent part, OCGA § 45-15-30, which was materially the same during the relevant timeframe as it is today, provides that,

> [n]otwithstanding that any attorney at law under independent contract to the Department of Law has been appointed or designated either specially or generally as an assistant attorney general and thus is identified with the State of Georgia as its representative for cases arising within the scope of that appointment or designation, representation of a defendant in criminal proceedings by that assistant attorney general shall not constitute a conflict of interest if that assistant attorney general provides written disclosure of such appointment or designation to the defendant prior to accepting employment by that defendant or, when a court has appointed an assistant attorney general to represent an indigent criminal defendant, disclosures to the defendant and to the court, to be reflected in the record of that court, such appointment or designation as assistant attorney general.

See also 1984 Ga. Att'y. Gen. Op. No. U84-27 (directing that Special Assistant Attorneys General comply with the disclosure requirements of OCGA § 45-15-30 in ordinary criminal cases and never represent a defendant in a death penalty case, regardless of whether the defendant might be willing to waive any potential conflict).

17

to make that disclosure adversely affected his representation of Gibson.

With respect to the subpoenas at issue, the record supports the habeas court's conclusion that Gibson failed to demonstrate that Mullis withdrew the subpoenas because of any loyalty he felt to the Attorney General's office or to forfeit any aspect of Gibson's defense. Gibson's claim that Mullis withdrew the subpoenas because he wanted to avoid a conflict with the Attorney General's office, "whose approval was essential for his job security," is based purely on speculation, and we have held that speculation is insufficient to show an actual conflict of interest. See *Adams*, 371 Ga. at 355 (determining that a defendant's speculation that his counsel's efforts and strategic choices were the result of a potential conflict of interest could not establish an actual conflict of interest). See also *Mahdi v. State*, 312 Ga. 466, 470 (2021) (concluding that the defendant's claim of a conflict of interest was "at best a matter of theory or speculation," which was insufficient to show an actual conflict of

18

interest). Moreover, while Gibson submits that Mullis admitted in his appellate brief to this Court in 1991 that he withdrew the subpoenas under pressure from the Attorney General's office, see *Gibson*, 261 Ga. at 315, Mullis's testimony at the habeas hearing belies that claim, and there is no evidence that Mullis withdrew the subpoenas to curry favor with the Attorney General. Instead, Mullis testified at the habeas hearing that he withdrew the subpoenas to avoid sanctions or being held in contempt by the trial court, not because of any divided loyalties on his part, and the habeas court was entitled to credit Mullis's testimony.

Gibson also contends that the habeas court erroneously based its denial of Gibson's habeas petition on the conflict-of-interest standard set forth in *Cuyler* and that the appropriate standard to apply in evaluating Mullis's conflict of interest is the standard set forth in *Sallie v. State*, 269 Ga. 446, 448 (1998) (providing that, when counsel is laboring under an obvious and impermissible conflict and the penalty is of vast enormity, there is no need to analyze the

19

adverse effect). However, Gibson offers no compelling reason why this Court should apply the unique standard articulated in *Sallie* to the conflict here, and we see none. See id. at 447–48 (holding that, where an attorney was simultaneously employed as a defendant's trial attorney and "the sole judicial law clerk" in the circuit where the defendant was being tried for murder, the conflict was "obvious" and "completely impermissible"—especially given that the defendant faced the death penalty—and prejudice was presumed).

The decision rendered by this Court in *Sallie* has been rarely applied and is limited to its distinct factual circumstances. See *Fogarty v. State*, 270 Ga. 609, 610–11 (1999) (noting that, although we applied the "per se presumption" of prejudice standard in the "unique situation" present in *Sallie*, we ordinarily apply the *Cuyler* standard and focus on whether "an actual conflict of interest adversely affected [the] lawyer's performance"). Although this Court later applied the *Sallie* standard in *Howerton v. Danenberg*, 279 Ga. 861 (2005), the Court did so only "under the unique facts of th[at]

case." Id. at 863 (applying *Sallie*'s presumption-of-prejudice standard to circumstances where an attorney had represented a defendant in a murder trial while also representing the assistant district attorney who was prosecuting that defendant in a separate civil lawsuit because that dual representation was "completely impermissible," "undermine[d] the adversarial process[,] and call[ed] into question the reliability of the outcome of proceedings"). But many of us question whether *Howerton* was decided correctly. And, here, based on the record before us, we readily conclude that the unusual and egregious circumstances warranting the application of a presumption-of-prejudice standard as set out in *Sallie* and *Howerton* are not present, and as such, we see no reason to deviate from our application of the *Cuyler* standard in this case. See *Fogarty*, 270 Ga. at 610–11.

Accordingly, as explained above, *Cuyler* is the appropriate standard to be applied in evaluating a conflict-of-interest claim like Gibson's. See *Cuyler*, 446 US at 348–50. And, because the habeas

court applied the *Cuyler* standard to conclude that, even if a potential conflict existed in this case, Gibson failed to meet his burden to show that Mullis's representation was "significantly or adversely" affected by the conflict—a conclusion that is supported by the record—we conclude that the habeas court did not err in denying Gibson's claim for habeas relief. See *Huitron*, slip op. at 21–22; *Hall*, 310 Ga. at 721.

*Judgment affirmed. All the Justices concur, except Peterson, C.J., not participating.*