313 Ga. 5
FINAL COPY

### S21A1092.  TAYLOR v. THE STATE.

BOGGS, Presiding Justice.

After an October 2012 jury trial, Daniel Taylor was convicted of malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of his father, Richard.[1] The trial court denied Taylor's motion for new trial, and he appeals, contending only that the evidence was insufficient as a matter of statutory law because it was entirely circumstantial and the State failed to exclude every reasonable hypothesis other than

---

[1] The shooting occurred on May 12, 2011. On August 9, 2011, a Fulton County grand jury indicted Taylor for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. Taylor was tried before a jury from October 15 to 17, 2012, and found guilty on all counts. Taylor was sentenced to serve life in prison for malice murder, plus five years in prison on the firearms charge; the trial court merged the aggravated assault charge into the malice murder count, and also improperly merged the felony murder charge, which actually was vacated by operation of law. Taylor's trial counsel filed a timely motion for new trial, which was amended by appellate counsel on June 6, 2019. After a hearing on March 10, 2021, the motion was denied on March 15, 2021. Taylor's notice of appeal was filed on April 13, 2021, and the case was docketed in this Court to the August 2021 term and submitted for a decision on the briefs.

his guilt. Because the evidence was sufficient as a matter of statutory law, we affirm.

Construed in the light most favorable to the jury's verdict, the evidence showed that, in the early morning hours of May 12, 2011, Taylor, his mother, Cherrie Ann Taylor, and his father, Richard, were sleeping in the living room of their home. Shortly before 2:00 a.m., Taylor's father was killed by a single 9mm bullet to the chest. Taylor's half-brother, Glen, and Glen's teenage daughter were also present in the home. At trial, Taylor's family members claimed that they could not recall most of the events surrounding the shooting or testified inconsistently with earlier statements to police officers or emergency personnel. The State then presented evidence of the family members' earlier statements, some of which were recorded and some testified to by witnesses, as follows.

The first police officer on the scene testified that Cherrie Ann told him she saw Taylor standing over his father and then heard gunshots. She identified Taylor by name, and when the officer found Taylor in the back yard of the house and asked him his name, he

2

gave the officer the same name. The officer then detained Taylor and placed him in the back of a patrol car. An EMT who responded to the scene testified that Cherrie Ann told him that she heard gunshots and "saw her son standing over her husband with a gun in his hand."

At the scene, Cherrie Ann also gave a recorded statement to the lead investigator. She said that she, Richard, and Taylor were asleep in the living room, with Taylor sleeping on the floor between her and Richard. The sound of a gunshot woke her up, and she saw Taylor, with a green gun in his hand, held "down to his side," standing over Richard. She screamed for someone to call the police, and Taylor left the room.

Glen also gave a recorded statement to the lead investigator, in which he stated that he was asleep in the basement when he heard Cherrie Ann screaming. He ran upstairs and saw Taylor in the family room, "pacing" with his hands in his pockets. Glen ran to find Cherrie Ann, and she told him, "Daniel [Taylor] was standing up over him and he shot him." Glen also stated that when the police arrived, Taylor "took off."

3

Approximately two weeks later, Glen's daughter was asked to give a recorded statement at Atlanta Police headquarters; she was accompanied by Cherrie Ann and Glen, who stated that they had additional information to give the lead investigator. Cherrie Ann told the investigator that she "was not one hundred percent sure" that it was Taylor standing over Richard with a green gun in his hand. Glen gave a second recorded statement, saying that when he came upstairs, Taylor walked past him from the kitchen-living room area into the family room and started pacing back and forth with his hands in his pockets, and then stopped and sat down. Glen asked Taylor, "What's the matter? What's the matter?" but Taylor did not answer. Glen told the investigator that the house doors were locked at night and only Cherrie Ann had a key. He also stated that on the day before the shooting, Taylor and Richard talked for a long time upstairs behind locked doors, and the family was never able to find out what they were discussing. Glen agreed with the investigator that this was "weird" or "odd." The lead investigator testified that Cherrie Ann also had referred to this conversation, stating that "her

4

husband had a weird look to him" and that she asked what he and Taylor were talking about, but he would not tell her.

Glen's daughter gave a recorded statement, stating that she was in her bedroom in the middle of the night when Taylor came in and asked her what time it was. She stated that this was unusual. She saw him walk downstairs and "a few minutes later" heard gunshots. She went downstairs and found her grandmother, Cherrie Ann, screaming, and Taylor was not there.

While Glen and his daughter testified at trial that they could not remember much of what they told the police, Cherrie Ann changed her account of the incident entirely. She testified that the person she saw standing over her husband was a tall, heavy stranger with a limp, dressed in bulky clothing so that she could not tell if the person was a man or a woman, but she was certain the person was not Taylor. She did confirm, however, that the gun the stranger was holding was green and that she thought it was Taylor's gun.

The lead investigator testified that, after he took initial

5

statements from Cherrie Ann and Glen, he spoke to Taylor, who was in the back of a patrol car. After reading Taylor the *Miranda* warnings,[2] the investigator asked if Taylor "would be willing to tell me where the firearm" was. Taylor responded that, if the investigator would go to his bedroom and bring him his keys and a cross from his bed, he would tell the investigator where the gun was. The investigator went and got the items, and Taylor then told him that if he went into the room to the right of the front door,[3] the gun would be underneath the cushion of the couch immediately on the left. The investigator looked under the cushion, where Taylor said the gun would be, and found a loaded, green Glock 9mm handgun with one round missing and an additional full magazine, as well as a black holster sitting on top of the same cushion.[4]

---

[2] See *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[3] Other witnesses described this as the "family room," where Glen told the police he had seen Taylor pacing after the shooting.

[4] In a later recorded audio statement to the lead investigator, Taylor stated that he was upstairs reading his Bible when he heard a gunshot and came downstairs to find his father had been shot. He had no explanation for his telling the investigator where to find the firearm, claiming that it was "déjà vu" or perhaps that he was "seeing things." Taylor did not testify at trial.

Evidence was also presented that Taylor previously purchased and registered the handgun the investigator found under the sofa cushion after Taylor directed him there. A ballistics expert testified that this pistol fired the 9mm shell casing found near Richard's body, and that the spent bullet recovered from the body, which was "extensively" fragmented, was consistent with having been fired from a Glock pistol. Gunshot primer residue was found on Taylor's hands, indicating that he was "in the vicinity" of a weapon when it was fired.

After a jury instruction on similar transaction evidence,[5] Taylor's uncle testified about an incident that occurred approximately four weeks before the shooting. While the uncle and Taylor were at the uncle's house, Taylor without any warning pulled out a pistol and pointed it at his uncle's head, and then held him at gunpoint for about an hour while asking apparently random

---

[5] This testimony was admitted under the pre-2013 standard for similar transaction evidence. See generally *Reeves v. State*, 294 Ga. 673, 675 (2) n.3 (755 SE2d 695) (2014).

7

questions.[6]

In his brief on appeal, Taylor argues only that the evidence was circumstantial and that the State failed to exclude every reasonable hypothesis save for his guilt, as required by former OCGA § 24-4-6.[7] The State does not concede that all the evidence presented was circumstantial. But we need not decide that point, because even if we assume that the evidence presented at trial was entirely circumstantial, it nonetheless satisfied the requirements of that Code section.

> The fact that the evidence of guilt was circumstantial does not render it insufficient. But, as a matter of Georgia statutory law, to warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused. Not every hypothesis is reasonable, however, and it is for the jury to determine whether an alternative hypothesis passes muster. Where the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis except of the

---

[6] In his statement to the lead investigator, Taylor denied any confrontation with his uncle.

[7] Taylor's 2012 trial took place while the former Evidence Code was still in effect, but the relevant provision is now codified as OCGA § 24-14-6 and is otherwise unchanged. See *Tyler v. State*, 311 Ga. 727, 731 (2) n.3 (859 SE2d 73) (2021).

accused's guilt, this Court will not disturb that finding
unless it is insupportable as a matter of law.

(Citations, footnote, and punctuation omitted.) *Anglin v. State*, 312

Ga. 503, 506-507 (1) (863 SE2d 148) (2021). And "[i]t is the role of

the jury to resolve conflicts in the evidence and to determine the

credibility of witnesses, and the resolution of such conflicts

adversely to the defendant does not render the evidence

insufficient." (Citations and punctuation omitted.) *Jones v. State*,

310 Ga. 886, 888 (1) (855 SE2d 573) (2021).

Here, the circumstantial evidence was sufficient to meet this

standard. Taylor's mother told police officers and an EMT that she

heard a gunshot and saw Taylor standing over Richard with his

pistol — the murder weapon — in his hand. Moreover, the mother

told Glen that Taylor "was standing up over [Richard] and he shot

him." Other witnesses stated that Taylor went downstairs only

minutes before the shooting; that shortly after the shooting he

emerged from the area where the shooting took place; that after the

shooting, he was distraught and pacing in the room where the

murder weapon was eventually found; and that he "took off" when

9

the police arrived. Taylor made inconsistent statements regarding what had occurred that evening. Evidence also was presented of a lengthy, private, and apparently unusual discussion between Taylor and Richard the day before the shooting. Ballistics evidence indicated that Taylor's pistol fired the fatal shot, and gunshot primer residue was found on Taylor's hands. Finally, Taylor negotiated with the lead investigator for certain personal items in exchange for revealing the location of the murder weapon, which was recovered by the investigator in the place Taylor described. The jury was authorized under former OCGA § 24-4-6 to find that this evidence excluded every reasonable hypothesis save that of Taylor's guilt.[8]

In his brief on appeal, Taylor proposes several theories that he contends the evidence failed to exclude. For example, he contends the murder could have been committed by a stranger entering the locked home or by another family member; or, he claims, Richard

---

[8] We no longer routinely consider the issue of sufficiency as a matter of constitutional due process in non-death penalty cases, when it is not raised by an appellant. See *Jones*, 310 Ga. at 889 (1) n.3.

could have committed suicide. He contends that he could have been wakened by the gunshot — even though his niece stated that he was awake a few minutes before Richard's murder — and, startled, could have picked up the pistol and then concealed it for his mother's safety, thus transferring gunshot residue to his hand and giving him knowledge of the murder weapon's location. But the evidence presented at Taylor's trial was legally sufficient to exclude every *reasonable* hypothesis other than Taylor's guilt. The jury was properly instructed on circumstantial evidence, and "[i]t is apparent from the verdict that the jury in this case found the state had excluded all reasonable hypotheses except that of guilt." *Reeves v. State*, 294 Ga. 673, 674-675 (1) (755 SE2d 695) (2014). See also *Jackson v. State*, 311 Ga. 626, 630-631 (2) (859 SE2d 46) (2021) (circumstantial evidence sufficient when witnesses saw appellant with handgun near scene of shooting, saw appellant and victim fighting, and saw car similar to that owned by appellant speeding away immediately after shooting).

*Judgment affirmed. All the Justices concur.*

11

Decided December 14, 2021.

Murder. Fulton Superior Court. Before Judge Newkirk.

*John R. Monroe*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.