317 Ga. 342
FINAL COPY

S23A0758.  ADAMS v. THE STATE.

ELLINGTON, Justice.

A Fulton County jury found Leon Adams IV ("Leon") guilty of malice murder and other offenses in connection with the shooting death of Laron Lowe and the aggravated assault of Ronda Dobson.[1] Leon contends that the evidence was constitutionally insufficient to support his convictions. He also argues that his trial counsel was

---

[1] On November 22, 2016, a Fulton County grand jury returned an indictment charging Leon Adams and his co-defendants Isaiah Adams and Malcolm Pitts with murder, felony murder (four counts), aggravated assault (two counts), criminal damage to property in the first degree, and possession of a firearm during the commission of a felony. Leon Adams was also charged with possession of a firearm by a first offender probationer. Leon and Isaiah Adams were tried on June 11, 2018; Pitts was tried separately. On June 15, 2018, the jury found the Adams brothers guilty on all counts. On June 25, 2018, the trial court sentenced Leon Adams to life in prison for malice murder, a consecutive ten-year sentence for the aggravated assault against Dobson, a concurrent ten-year sentence for first degree criminal damage to property, and consecutive five-year sentences for the firearm counts.  The four counts of felony murder were vacated, and a count of aggravated assault against Lowe merged at sentencing. The Adams brothers' trial counsel timely filed a motion for a new trial. New appellate counsel for Leon Adams twice amended the motion. After hearings held on the motion for a new trial on September 9 and 21, 2021, the trial court entered an order denying the motion on March 2, 2023. A notice of appeal was timely filed on March 7, 2023, and the case was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

constitutionally ineffective because counsel had an actual conflict of interest arising out of his joint representation of Leon and his co-defendant and brother, Isaiah Adams ("Isaiah"). For the reasons set forth below, we discern no reversible error and affirm the judgment of conviction.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On August 21, 2016, Lowe, who was sitting in the passenger seat of a car driven by his fiancée, Dobson, was killed when shots were fired from a white car that had followed the couple from the 29 Degrees nightclub, an after-hours club in Fulton County where both worked. The prosecution presented video evidence, witness testimony, and the defendants' own admissions to show that Leon, Isaiah, and Malcolm Pitts were in the white car. The State also presented evidence from which the jury could infer that the shooting may have been motivated by an argument that occurred earlier in the nightclub. The nightclub's general manager, Omari Ward, testified that around 6:00 a.m., as he began ushering people out of the nightclub, a server

2

came up to him and told him that Leon and Isaiah were arguing with a bartender over who could drink the most. Ward — who is Leon's cousin — approached the men and asked them to leave. Ward assumed the argument was not serious. Other witnesses testified, however, that the argument had gotten "heated" and "there was some pushing and shoving."

Ward testified that he escorted the Adams brothers outside at about 6:45 a.m. and then went back inside to work. A video recording from a security camera outside the club showed Ward stepping outside briefly with the brothers, talking with them, and then going back inside the club at 6:52 a.m. At trial, Ward identified the brothers from the video recording, which was played for the jury, and also pointed out the brothers' friend, Malcolm Pitts, who was wearing a white shirt. Lowe is also visible on the video recording, but Ward testified that he did not witness any interaction between Lowe, Pitts, and the Adams brothers. Lowe, who was Ward's best friend, worked as a parking lot attendant.

Dobson worked at the nightclub as a security guard. After the

nightclub closed, Dobson picked up her pay, left the building, and walked toward her black Chevy Tahoe. She testified that she stopped in the parking lot to talk to Lowe and told him she would wait for him to get off work. At about 6:55 a.m., Lowe got in the front passenger seat of Dobson's car, and the two drove off. Dobson testified that she saw a white car idling nearby, but she thought the driver was just letting her leave the parking area ahead of them. Dobson said that, as she turned left out of the parking area, she did not notice anyone behind her. Video surveillance, however, showed that the white car — later identified as a white Ford Escape — also turned left, following her. After driving a few blocks away from the club, Dobson noticed the white car pulling up along the left side of her car. She testified that, because she was driving slowly, she assumed the driver was passing her. When the car was parallel to her car, she saw an arm extending from the open front, passenger-side window. The person wore a long-sleeved, white or light-colored shirt and held a gun in his hand. And then she heard the first gunshot.

4

Dobson immediately turned and yelled to Lowe: "Baby, they are shooting at us." But Lowe was unresponsive, having been shot in the left temple. Dobson testified that she heard approximately four to six gunshots thereafter. The bullets shattered the driver's side windows and punctured holes in the driver's side quarter panel and the hood of the car. The driver's-side, rear caution light was also damaged by the gunfire. Dobson slowed down and stopped, but the shooting continued. She quickly backed up, turned around, and drove back to the nightclub to get help. When she arrived at the nightclub and saw that people were still outside, including Ward, she honked her car's horn and began screaming for help. Dobson got out of her car and fell to the ground, shouting: "Please don't let him be dead." Ward ran to help Lowe, but there was nothing he could do. Lowe took his "last gasp of air" and died.

When the police arrived at the nightclub, Ward showed them the video recordings from his security cameras. As he looked at the recordings with the officers, he identified Pitts and the Adams brothers getting into a white Ford Escape that matched the

description of the car Dobson said had followed her and Lowe. Isaiah got into the driver's seat, Pitts got into the front passenger seat, and Leon got into the back passenger seat. Ward told the police that, during the weekend before the shooting, he had seen Isaiah with a .380-caliber handgun and Leon with a pink revolver. He also testified that Pitts was known to carry a firearm, though he did not see him with one that night. After reviewing the video recordings, Ward got into a patrol car with officers and directed them to the Adams brothers' home. When they arrived, they saw a white Ford Escape in the driveway. An officer testified that the car matched the car seen in the nightclub's security video recordings.

While Ward showed the officers where the Adams brothers lived, other officers found and gathered evidence from the roadway where Dobson said the shooting had occurred. The police recovered 11 shell casings from the roadway. They recovered five 9mm shell casings, four .40-caliber shell casings, and two .380-caliber shell casings.

On August 22, 2016, the police executed an arrest warrant for

6

the Adams brothers at their home. Officers knocked at the front door, and a woman permitted them to enter. When they showed the woman the warrant, she claimed nobody else was in the residence. But then Xavier Adams — Isaiah's twin brother — walked out and stood next to her, leading the officers to believe that she was lying. The officers searched the house for the brothers and found Isaiah hiding in a bedroom and detained him there. They found Leon in the closet of another room, curled up inside a large storage bin. During their search for the brothers, the officers saw two handguns in Isaiah's room. Upon seeing the weapons, the officers secured the residence and obtained a search warrant for the home. During the search that followed, officers found several more firearms (including handguns, long guns, and semi-automatic rifles), as well as various types of ammunition. They recovered clothing that appeared to match clothing worn by the brothers on the day of the shooting, and they found papers belonging to Pitts.

The firearms recovered included a SAR Arms 9mm handgun. Further investigation revealed that this gun had been stolen from

its owner a few days before the shooting. The owner testified that he kept the gun in the door panel of his truck. The last time he saw the gun was during a lunch break, when he was accompanied in his car by his co-worker, Xavier Adams. Also during the search, officers recovered several cell phones. One of those phones, which was found in Isaiah Adams's room, had been used on the evening after the shooting to conduct over three dozen Internet browser searches for information regarding the shooting and Lowe's death.

Pursuant to a search warrant, a GBI crime scene investigator processed the white Ford Escape for evidence. The investigator recovered an extended handgun magazine in the pocket on the back of the driver's seat. The magazine contained thirteen .380-caliber bullets. The investigator recovered a 9mm shell casing from beneath the driver's seat and cut a piece of cloth from the interior of the car. The cloth tested positive for gunshot residue.

After Pitts was arrested, the police secured a search warrant for his residence. During the search, the police found a white hoodie matching what Pitts was seen wearing on the night of the shooting.

The hoodie tested positive for gunshot residue.

The medical examiner who performed Lowe's autopsy testified that Lowe had a gunshot entrance wound to the left side of his head. The bullet traveled through his brain and came to rest against the right side of his skull. The medical examiner determined that the gunshot wound to Lowe's head was the cause of death. The medical examiner recovered the bullet and turned it over to the GBI.

A GBI firearms examiner analyzed the ballistics evidence collected from the scene of the shooting, from the medical examiner, and from the Adams home. The examiner determined that the 9mm shell casing recovered from beneath the driver's seat of the Ford Escape, along with three of the 9mm shell casings recovered from the scene of the shooting, were all fired from the SAR Arms 9mm pistol recovered from the Adams residence. The firearms examiner determined that the bullet recovered from Lowe's head was a .380 metal-jacketed bullet. He was unable to match that bullet to a specific firearm, however, as no comparable weapon had been recovered for testing. The examiner opined that, given the many

9

different types of ammunition found at the scene of the shooting, it was possible that six to eight different firearms had been fired there; however, at a minimum, two different firearms had been confirmed as having been used in the shooting: a 9mm and a .380-caliber weapon. He further testified that "[t]he typical firearm is going to be about the same sound [level] as a jackhammer, slightly less than the speed of sound but still loud enough to impair your hearing without hearing protection."

Before trial, Leon and Isaiah both gave recorded statements to the police. The prosecution did not play Leon's recorded statement for the jury. Instead, a detective testified that, after waiving his rights, Leon told him that Isaiah was driving the car. Leon said that, when he got into the back seat of the car, he was drunk and tired and immediately fell asleep. He claimed he slept through the shooting. In Isaiah's statement, which was played for the jury, he confirmed that he was driving, that Pitts was in the passenger seat, and that Leon was in the back seat. Isaiah said that he, too, was drunk that night and that he was surprised when Pitts, without

10

warning, began shooting two guns out of the passenger side window at another vehicle. Isaiah believed he heard his brother yelling something, but it was hard to tell over the gunfire.

On November 12, 2016, Leon called his mother from jail. The call, which was recorded, was played for the jury. Leon asked his mother if anyone in the home had "protection," and she confirmed that Xavier did. He asked his mother if law enforcement had obtained two items (which he did not identify directly), one of which was on top of the refrigerator and one of which was in a cabinet above the refrigerator. His mother said that Xavier had removed them from the house. Leon then directed his mother to look for a folder in a filing cabinet where he hid his things. He told her to be careful where she put her finger and not to "pull the trigger." The mother can be heard on the recording opening the cabinet drawer, laughing, and then asking Leon if the object had been there the whole time. Leon told his mother to give the object to "Shonda." The mother said that Shonda was there, and she put her on the phone. Leon told Shonda that the gun his mother had just found was the

11

gun he always kept on his hip, even when he was sleeping, but that on the night before the search (which was the night following the shooting), he took the gun off his hip and put it in the cabinet. Leon commented that, had he not done so, law enforcement would have found the gun during the search. This gun was not recovered by the police.

The State also presented evidence that neither Dobson nor Lowe carried firearms with them on the night of the shooting. Dobson's car was in the body shop for almost a month, and she spent approximately $4,500 to repair the damage done to her car by the shooters. Finally, certified records establishing that Leon was a first-offender probationer at the time of the shooting were admitted in evidence.

Leon argues that the evidence presented at trial and summarized in part above was not sufficient to support beyond a reasonable doubt his convictions for malice murder, aggravated assault, criminal damage to property, possession of a firearm during the commission of a felony, and possession of a firearm by a first-

offender probationer. He contends that the State failed to prove that he had any motive for shooting at Lowe and Dobson. He also argues that the evidence was entirely circumstantial and that the State failed to disprove the reasonable hypothesis that Pitts acted alone, firing two handguns from the car as Isaiah drove past Dobson and Lowe. We disagree.

When evaluating the constitutional sufficiency of evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). Under Georgia law, a person who "[i]ntentionally aids or abets in the commission of the crime" may be convicted as a party to the crime. OCGA § 16-2-20 (a), (b) (3). "Although mere presence at the scene of a crime is not sufficient to prove that one was a party

to the crime, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." (Citation and punctuation omitted.) *Powell v. State*, 291 Ga. 743, 744-745 (1) (733 SE2d 294) (2012).

Further, under Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis — only those that are reasonable." (Citation and punctuation omitted; emphasis in original). *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019). "Whether alternative hypotheses are reasonable . . . is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law." *Robinson v. State*, 309 Ga. 729, 731 (1) (a) (848 SE2d 441) (2020).

The evidence was sufficient as a matter of constitutional due process for the jury to infer that Leon participated in the crimes and shared Pitts's and Isaiah's criminal intent. The Adams brothers were involved in a "heated" argument inside the nightclub shortly before the shooting. The jury could infer from that argument that the brothers were intoxicated and angry after being kicked out of the club and that the argument may have motivated their actions. The brothers and Pitts left the club at the same time, waited together in an idling car, and then followed Dobson and Lowe from the club. Given the short period of time between when the three men got into the car and when Isaiah drove the car alongside Dobson's car, the jury could infer that it was unlikely that Leon was, as he claimed, merely present, drunk, and asleep in the back seat of the car when the shooting occurred. Likewise, the jury could have readily concluded that it was unlikely that Leon slept through the gunfire as he claimed, given how loud it would have been. Also, Leon had been seen with a gun just days before the shooting, and he said in a recorded jail call that he always kept a gun on his hip, even

when sleeping — perhaps the very gun he asked his friend to remove from his house. Police recovered from the back pocket of the driver's seat, accessible to where Leon had been sitting in the back seat, an extended magazine for a .380-caliber handgun. The fatal bullet removed from Lowe's head was a .380-caliber bullet. Although Isaiah was known to carry a .380-caliber handgun, and Leon may have had his own weapon strapped to his hip, the jury could have inferred that Leon fired Isaiah's gun, if not his own, because Isaiah was driving. The jury could also infer from the conversation that Leon had with his mother that Leon knew which gun was the murder weapon because he was relieved that it had not been recovered and wanted it removed from his home.

The State also proved that, in addition to the .380-caliber handgun used to shoot Lowe, a 9mm handgun was fired into Dobson's car. That handgun was discovered in the Adams home in Isaiah's room the day following the murder. Further, a cell phone seized from the Adams home following the brothers' arrest contained evidence that the phone's user had, immediately after the shooting,

16

conducted more than three dozen Internet searches for news about the shooting. And, when the police came to his home, Leon attempted to evade them by hiding in a storage bin in a closet — a fact from which the jury could infer consciousness of guilt.

With respect to Leon's assertion that he had no motive to shoot Dobson, "the State need not introduce evidence of motive in order to support a guilty verdict on the charge of malice murder." *Mangram v. State*, 304 Ga. 213, 217 (III) n. 3 (817 SE2d 682) (2018). See *Romer v. State*, 293 Ga. 339, 341 (1) (b) (745 SE2d 637) (2013) ("[W]hile evidence of motive for the homicide is always *relevant* in a murder trial, the State is not *required* to prove the defendant's motive for killing the victim to sustain a murder conviction, since motive is not an essential element of the crime." (citations omitted; emphasis in original)).

The evidence here is sufficient as a matter of constitutional due process to support the jury's finding that Leon, acting in concert with Pitts and Isaiah, was a party to the crimes of malice murder, aggravated assault, and criminal damage to property, and that he

was in possession of a firearm during the commission of a felony. See *Jackson*, 443 U. S. at 319 (III) (B); *Meadows v. State*, 316 Ga. 22, 25 (2) (885 SE2d 780) (2023); *Williams v. State*, 313 Ga. 325, 328 (1) (869 SE2d 389) (2022). See also OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime."). The evidence adduced also supports the jury's verdict that Leon committed the offense of possessing a firearm while on first-offender probation. See *McCain v. State*, 300 Ga. 400, 401 (794 SE2d 58) (2016).

Additionally, the evidence was sufficient under OCGA § 24-14-6. Leon's alternate hypotheses about how the shooting may have occurred were not reasonable, given the evidence adduced. As the trial court explained in its order denying Leon's motion for a new trial:

> [The jury] could eliminate as unpersuasive and unrealistic the hypotheticals that (1) [Leon] miraculously dozed through the chaos, (2) the front seat passenger who was seen [by Dobson] with one gun somehow invisibly wielded a second one, or (3) the driver used guided bullets to avoid his two passengers as he strafed Dobson's vehicle from back to front.

Indeed, the more reasonable hypothesis that the jury was allowed to credit was that Pitts and Leon were the shooters, and that they fired on Dobson and Lowe when Isaiah intentionally pulled his car alongside Dobson's after following them from the nightclub. See *Lowe v. State*, 295 Ga. 623, 625 (1) (759 SE2d 841) (2014) ("[Q]uestions as to the reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is insupportable as a matter of law.").

2. Leon contends that, as a result of counsel's joint representation of him and his brother, he received constitutionally ineffective assistance of counsel based on "an actual conflict of interests at trial, with [counsel's] dual client loyalties affecting his representation," and "neither the purported waiver of conflict that he gave at a pretrial suppression hearing, nor anything else in the record, shows an enforceable waiver of the conflict." Assuming, arguendo, that the written waiver that Leon executed was legally

19

insufficient to waive an actual conflict, we see no merit to his contention that his trial counsel was laboring under an actual conflict of interest.[2] Consequently, Leon's ineffective assistance of counsel claim fails.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." "It is well established that the right to counsel protected by the Sixth Amendment . . . is the right to the effective assistance of counsel." (Citations and punctuation omitted.) *Edwards v. Lewis*, 283 Ga. 345, 348 (2) (658 SE2d 116) (2008).

"One component of the right to the effective assistance of counsel is the right to representation that is free of *actual* conflicts of interest." (Emphasis supplied.) *Edwards*, 283 Ga. at 348 (2). Joint representation alone does not amount to an actual conflict of

---

[2] In assuming, for purposes of evaluating this claim of error, that the waiver executed by defense counsel and the Adams brothers was invalid, we do *not* pretermit or assume the existence of an actual conflict of interest. See *Woods v. State*, 275 Ga. 844, 845 (2) (573 SE2d 394) (2002) (addressing question of actual conflict after assuming waiver invalid).

interest. See *Burns v. State*, 281 Ga. 338, 340 (638 SE2d 229) (2006).

Rather, for purposes of evaluating an ineffective assistance claim, "'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance* — as opposed to a mere theoretical division of loyalties." (Emphasis in original.) *Mickens v. Taylor*, 535 U. S. 162, 171, 172 (II) n.5 (122 SCt 1237, 152 LE2d 291) (2002). See also *Cuyler v. Sullivan*, 446 U. S. 335, 349 (IV) (B) (100 SCt 1708, 64 LE2d 333) (1980) (An actual conflict of interest is a conflict that "actually affected the adequacy of [counsel's representation.]").[3]

---

[3] In *Tolbert v. State*, 298 Ga. 147, 149 (2) (a) (780 SE2d 298) (2015), we explained that, when evaluating a claim of ineffective assistance of counsel based on a conflict of interest, an "actual conflict [is not] something separate and apart from adverse effect," which might imply that a defendant is required to show both an actual conflict and resulting prejudice affecting the outcome of the trial. (Citation and punctuation omitted.) Rather, an actual conflict, in this context, is a conflict that actually adversely affected counsel's representation or performance as defense counsel. The term "actual conflict" is used to distinguish such conflicts, for which resulting prejudice to the outcome of the trial is presumed, from those potential conflicts that are insufficient to support a finding of prejudice to a defendant. See *Mickens*, 535 U. S. at 166 (II) ("We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect," in the ineffective assistance of counsel context "when the defendant's attorney actively represented conflicting interests." The reason being that, when an actual conflict has occurred "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary."); *White v. State*, 287 Ga. 713, 722 (4) (a) (699 SE2d 291) (2010) ("In such circumstances, to obtain relief, the defendant need

To carry his burden of proving that his appellate counsel . . . provided ineffective assistance because [counsel] had a conflict of interest, [the defendant] must show that an actual conflict of interest significantly and adversely affected [counsel's] representation of [the defendant. The defendant] need not show actual prejudice, that is, a reasonable probability that the outcome of his motion for new trial or direct appeal would have been more favorable to him if [counsel] had not labored under a conflict of interest. Instead, prejudice is presumed if [the defendant] demonstrates that the conflict of interest existed and that it significantly affected [counsel's] performance."

only demonstrate that the conflict of interest existed and that it significantly affected counsel's performance."); *Cuyler*, 446 U. S. at 348-350 (IV) (B), (C) ("[A] possible conflict [of interest] inheres in almost every instance of multiple representation," and "the possibility of a conflict is insufficient to impugn a criminal conviction.").

The critical question is whether the conflict significantly affected the *representation*, not whether it affected the outcome of the underlying *proceedings*. That is precisely the difference between ineffective assistance of counsel claims generally, where prejudice must be shown [under the two-part test set forth in *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)], and ineffective assistance of counsel claims involving actual conflicts of interest, which require only a showing of a significant effect on the representation.

(Citation and punctuation omitted; emphasis in original.) *Hall v. Jackson*, 310 Ga. 714, 720 (2) (a) (854 SE2d 539) (2021). See also *Moss v. State*, 312 Ga. 202, 205-206 (2) (a) (862 SE2d 309) (2021) (same). In general parlance, a "conflict of interest" is one in which "there is a substantial *risk* that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person." (Citation and punctuation omitted; emphasis supplied.) *Burns*, 281 Ga. at 339 n.3. Thus, in the ineffective assistance of counsel context, if an alleged conflict is not an actual conflict, this Court often refers to such a conflict as a "potential" conflict. See *Hall*, 310 Ga. at 721 (2) (a).

22

(Citations and punctuation omitted.) *Hall v. Jackson*, 310 Ga. 714, 720 (2) (a) (854 SE2d 539) (2021). See also *State v. Abernathy*, 289 Ga. 603, 607 (3) (715 SE2d 48) (2011) ("[I]n order to establish ineffective assistance arising from a conflict of interest, a defendant must show the existence of an actual conflict that adversely affected counsel's performance."); *Woods v. State*, 275 Ga. 844, 845 (2) (573 SE2d 394) (2002) ("The premise of a defendant's claim that he was denied conflict-free assistance because of joint representation must be that his lawyer would have done something differently if there was no conflict." (citation and punctuation omitted)). Further, the alleged actual conflict of interest must not be "theoretical or speculative"; rather, it must be "palpable and have a substantial basis in fact." (Citation and punctuation omitted.) *Mahdi v. State*, 312 Ga. 466, 470 (3) (863 SE2d 133) (2021).

> As we review the decision of the trial court[ on a conflict-of-interest claim], we owe no deference to its application of the law to the facts of this case. We owe substantial deference, however, to the way in which the trial court assessed the credibility of witnesses and found the relevant facts. To that end, we must accept the factual

findings of the trial court unless they are clearly erroneous, and we must view the evidentiary record in the light most favorable to the findings and judgment of the trial court.

(Citations omitted.) *Tolbert v. State*, 298 Ga. 147, 151 (2) (a) (780 SE2d 298) (2015).

After hearing testimony and argument at the motion for a new trial hearing on Leon's contentions that his trial counsel's performance was adversely affected by the joint representation, the trial court concluded that Leon had not shown an actual conflict: the brothers' defenses were not antagonistic, and their lawyer was never faced with a fundamental division of loyalties, either due to a plea opportunity for one brother but not the other or the need to pit one brother against the other. Because Leon failed to prove an actual conflict, that is, a conflict that adversely affected counsel's representation of him, the trial court found that Leon had not carried his burden of proving his claim of ineffective assistance of counsel predicated on an actual conflict of interest. For the reasons set forth below, Leon has not shown that the trial court's ruling was

24

erroneous.

Leon contends that his trial counsel knew that the State's evidence incriminated Isaiah much more than it incriminated him, implying that their defenses were antagonistic. He also argues that, as a result of the joint representation, counsel refrained from making decisions and pursuing trial strategies that might have benefitted him, that is, seeking a plea deal for Leon in exchange for his testimony against Pitts and his brother, using the brothers' "conflicting" statements and varying levels of cooperation with the police to Leon's benefit, crafting a closing argument that emphasized Leon's mere presence during the shooting, and moving on Leon's behalf for directed verdicts.

However, at the motion for a new trial hearing, defense counsel testified that, given the evidence in this case, especially the brothers' statements to the police, he believed that Leon's only plausible defense was mere presence. According to counsel, Leon made it very clear that he was not going to testify against Isaiah and that he was unwilling to present a defense that painted his brother as Pitts's

accomplice. The brothers steadfastly refused to incriminate each other, and they were adamant that they would not testify against each other. Thus, as counsel explained, the brothers' defenses could be presented in a way that was not antagonistic: Leon was drunk and asleep in the back seat when Isaiah, the driver, was unwittingly made a participant in the shooting when Pitts fired at Lowe as Isaiah passed Dobson's car.

Further, according to defense counsel, neither brother expressed a desire to seek a plea deal. Nevertheless, counsel inquired whether the prosecution had any plea offers. Counsel testified that he dealt with two different prosecutors, both of whom informed him that they would only accept guilty pleas if the brothers agreed to sentences of life in prison. Neither prosecutor expressed interest in allowing either brother to plead to a lesser charge in exchange for testimony against the other defendants. Consequently, a plea deal was unavailable even if one of the brothers had been interested in a deal and was represented by his own attorney.

With respect to the brothers' statements, the record shows

26

that, although they were not entirely consistent, they were not contradictory. Isaiah said he thought he heard Leon shouting over the gunfire; Leon claimed he was drunk and fell asleep in the back seat of the car. Trial counsel explained that, even if the brothers were tried separately, their respective attorneys would still have to find a way to explain Leon's statement denying any awareness of the shooting while his brother said that he thought he heard Leon shouting. Counsel's closing argument shows that he attempted to harmonize the statements, focusing on their consistencies, and blamed Pitts entirely for the shooting.

Leon also complains that he and his brother had competing interests at trial because Isaiah, unlike him, was a more "cooperative" defendant. At the hearing on Leon's motion for a new trial, trial counsel explained that he understood that Isaiah was "in more peril" than Leon and that Isaiah's cooperation with law enforcement was an effort to mitigate his involvement in the shooting. Although the record shows that Leon was, indeed, less cooperative with the police than his brother, counsel presented the

jury with a reasonable explanation for that. During the trial, a prosecutor asked a detective this question: "Is it fair to say that everything [Leon] did [in his interview] was deny everything about that day," to which the detective responded: "Yes." Defense counsel then revisited this issue during cross-examination, reframing Leon's denials as Leon simply being unwilling to participate in the investigation, which, as counsel asserted and as the detective agreed, a criminal defendant has the right to do. Then, during closing argument, trial counsel argued to the jury:

> So that leaves us with the individual who sort of puts this together for us, doesn't it. That would be Isaiah. First off, you heard that both Isaiah and Leon were interviewed by Investigator Garcia. Garcia testified that in his opinion Isaiah was cooperative. Leon not so much, but he also told you that that's [Leon's] right. Just like he doesn't have to talk in court today, he doesn't have to say anything to investigators. It's not his job.

Again, counsel made choices intended to harmonize the brothers' defenses. Counsel has not shown that Isaiah's cooperativeness resulted in the brothers' defenses being antagonistic. There is no evidence that either brother tried to shift the blame to the other. To

28

the contrary, their defenses were consistent: Pitts acted alone.

With respect to why he did not move for any directed verdicts, counsel did not recall why he did not. However, Leon has not shown that separate counsel would have chosen to pursue a motion for a directed verdict on any of the charged offenses under circumstances such as these, where there is no evidence that Leon would have been entitled to a directed verdict.[4]

Given the evidence in this case, Leon has not shown that any of the trial court's factual findings were erroneous or that the joint representation adversely affected counsel's representation of him and, therefore, constituted an actual conflict of interest. At best, Leon has only speculated that counsel's efforts and strategic choices were the result of a potential conflict of interest inherent in joint representation. Consequently, the trial court did not err in denying

---

[4] The trial court may direct a verdict "[w]here there is no conflict in the evidence and the evidence introduced with all reasonable deductions and inferences therefrom shall demand a verdict of acquittal or 'not guilty[.]'" OCGA § 17-9-1. Leon has not shown that the evidence demanded a verdict in his favor. Moreover, as set forth in Division 1, the evidence presented was sufficient to sustain Leon's convictions beyond a reasonable doubt.

29

Leon's motion for a new trial on his claim of ineffective assistance of counsel predicated on an actual conflict of interest arising from his joint representation. See, e.g., *Mahdi*, 312 Ga. at 470 (3) (The defendant's claim of a conflict of interest was "at best a matter of theory or speculation" insufficient to show an actual conflict and support a claim of ineffective assistance of counsel.); *Woods*, 275 Ga. at 846 (2) (no actual conflict shown where the record fails to establish that, but for the alleged conflict, counsel "would have done something differently" (citation and punctuation omitted)); *Henry v. State*, 269 Ga. 851, 854 (3) (507 SE2d 419) (1998) (For a criminal defendant to show counsel was ineffective due to a conflict of interest, "[t]he conflict of interest must be palpable and have a substantial basis in fact. A theoretical or speculative conflict will not impugn a conviction . . . which is supported by competent evidence." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided September 19, 2023.

Murder. Fulton Superior Court. Before Judge McBurney.

*Stephen R. Scarborough*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General,* for appellee.