NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 13, 2024

S24A0574. NUNNALLY v. THE STATE.

COLVIN, Justice.

Appellant Malik Nunnally appeals his convictions for malice murder and other crimes related to the death of Maya Mitchell.[1] On

---

[1] Mitchell died on December 31, 2018. On July 30, 2019, a DeKalb County grand jury charged Appellant with malice murder (Count 1), felony murder (Count 2), armed robbery (Count 3), aggravated assault (Count 4), possession of a firearm by a first offender probationer (Count 5), and possession of a firearm during the commission of a felony (Count 6).

A jury trial was held from August 26, 2021, through September 2, 2021. At trial, the trial court granted Appellant's motion for directed verdict as to Count 3. The jury found Appellant guilty of the remaining counts (Counts 1-2, 4-5). On September 2, 2021, the trial court sentenced Appellant to life in prison for malice murder, five years in prison concurrent for possession of a firearm by a first offender probationer, and five years in prison consecutive for possession of a firearm during the commission of a felony. The felony-murder count was vacated by operation of law, and the aggravated-assault count merged into the malice-murder count for sentencing purposes. See *Favors v. State*, 296 Ga. 842, 847-848 (5) (770 SE2d 855) (2015).

Appellant timely filed a motion for new trial and amended it through new counsel on October 6, 2023. Following a hearing on October 30, 2023, the trial court denied Appellant's amended motion for new trial on December 8, 2023.

Appellant timely filed a notice of appeal to this Court on December 20,

appeal, Appellant contends that the evidence was constitutionally and statutorily insufficient to support his convictions. Appellant also argues that the trial court erred in instructing the jury on party to a crime. For the reasons that follow, we affirm.

1. The trial evidence showed the following. On December 30, 2018, Mitchell spent the day at the home of her boyfriend, Xavier Lamar, in Decatur and left at some point in the evening to meet Appellant. At approximately 9:15 a.m. the following morning, a person walking in Glen Emerald Park discovered a body lying in a wooded area a few feet off the path and called 911. The body, which had a gunshot wound to the head, was later identified as Mitchell.

At trial, Lamar testified that he and Mitchell started dating in August 2018 and that she moved in with him in November 2018. He stated that they smoked marijuana together at his home and that Mitchell would often leave to buy marijuana even though Lamar already had marijuana for them to smoke. At first, Mitchell did not

2023. This appeal was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

2

tell Lamar who her supplier was, just that she bought it from an area "off Bouldercrest [Road]." Eventually, however, she showed Lamar a television show on which her supplier was featured and identified a man on the show as her supplier. At trial, Lamar identified Appellant as the man he had previously seen on the show.

Lamar testified that on the evening of December 30, 2018, "[Mitchell and I were] just chilling in the bed, just watching TV, watching movies and stuff." According to Lamar, Mitchell was on her phone texting and calling throughout the evening and left his home at some point between 10:00 p.m. and midnight to meet Appellant.[2] Lamar stated that "she said she'd be right back," and that when she left his house, she was wearing a sweatshirt, gray sweatpants, and slippers. On redirect examination, Lamar admitted that he suspected Mitchell was cheating on him.

Appellant's girlfriend, Jazmin McClendon, testified that she

---

[2] On direct and cross-examination, Lamar conceded that he previously told investigators that Mitchell left his home around 2:00 a.m. on December 31, 2018. Notwithstanding his prior statement, Lamar confirmed at trial that Mitchell left between 10:00 p.m. and midnight.

3

and Appellant started dating in August 2018 and that Appellant did not have a car or a job. McClendon also testified that she had two cell phones, one with a phone number ending in –2170 that she gave Appellant in November 2018 for him to use, and the other ending in –2761, which she used. McClendon further confirmed that Appellant had possession of the phone corresponding to the –2170 phone number on the night of December 30, 2018. McClendon testified that on that night, Appellant told her that he was leaving to sell a gun and that he would return soon, which she believed would be no more than 30 minutes later. After 30 minutes passed, she called him multiple times, but he did not answer her calls. At some point, he called her back and said that he would be home soon. However, at trial, McClendon testified that she could not recall when she next saw Appellant; instead, she could only recall that she met Appellant to retrieve her phone on or before January 7, 2019, when she was questioned by police.

Mitchell's parents testified that they tried to contact Mitchell on December 31, 2018, but could not reach her. Becoming concerned,

4

Mitchell's mother used her tablet, which was synced with Mitchell's cell phone, to locate Mitchell. Her tablet placed Mitchell's cell phone near a dumpster at a gas station on Gresham Road. A picture of the tablet displaying the location of Mitchell's cell phone was entered into evidence. Mitchell's mother testified that she and her husband drove to the gas station but did not find Mitchell's phone there.

Mitchell's mother testified that because her tablet was synced with Mitchell's phone, she could read the text messages on Mitchell's phone. Using this information, she began calling the numbers Mitchell's phone had recently texted. These numbers included the number corresponding to the phone McClendon had provided to Appellant. When Mitchell's mother called this number, a man answered and introduced himself as "Lee." Mitchell's mother testified that, over the course of several conversations on December 31, the man stated that he and Mitchell were "supposed to meet" the previous night. "Lee" suggested they look for Mitchell at various locations, including two apartment complexes on Gresham Road near the gas station where her parents had previously searched for

Mitchell's phone, a gas station where Mitchell's car was allegedly seen, a grocery store, and, ultimately, Glen Emerald Park. The mother testified that the man also told her that a body had been found in Glen Emerald Park but that it was not on the news yet. Mitchell's father also called the number ending in –2170 and spoke to the man purporting to be "Lee." The father testified that the man told them that he was supposed to meet Mitchell on the night of December 30 but that he "stood her up" and stayed at home with his baby's mother. The man also told him that he sent his brother to meet Mitchell that night.

Photos of Mitchell's mother's tablet displaying text messages from Mitchell's phone with the phone number ending in –2170 from December 2018 were entered into evidence and showed the following. On the evening of December 19, the –2170 number texted, "I'm with my brother" and then the two discussed meeting. Early in the morning of December 22, the –2170 number texted Mitchell's phone, "[yo]u trying to come thr[ough][?]" and sent his current location, to which Mitchell's phone responded, "I'm on my period

6

tho[ugh]." On December 23, Mitchell's phone texted the –2170 number, asking him if he had any "gas," to which he responded that he did but that he only had "seven . . . left."

On the evening of December 30, Mitchell's phone and the –2170 number texted numerous times, beginning at 10:23 p.m. and ending at 1:05 a.m. the following morning. The text messages from December 30 to December 31 primarily concerned the two meeting for the user of Mitchell's phone to purchase "gas" from Appellant. The –2170 number also asked Mitchell's phone if they wanted to "get one off in the car." After going back and forth about where to meet, the –2170 number told Mitchell's phone at 10:36 p.m. to meet him at an address on Bouldercrest Road, which he said was near his old neighborhood, Paradise East Apartments. At 11:40 p.m., the –2170 number told Mitchell's phone to "go to the park . . . across from the neighborhood." At 11:44 p.m., the –2170 number texted, "[m]y brother is at the park[.] He has my weed[.]"At 1:05 a.m. on December 31, 2018, Mitchell's phone sent the –2170 number the last known text from her phone, which read, "I[']m blocking [yo]ur number[,]

7

[yo]u bitch."

Law enforcement personnel used data from phone records for Mitchell's phone and the phone ending in –2170 to generate a "TRAS" report, which consolidated information regarding the contacts between the two phones into a "readable form." This report was entered into evidence and shown to the jury. The detective who generated the report testified that "these two devices [were] commonly in contact with each other at the end of the night or the very beginning of the morning." The report showed there were eight calls between Mitchell's phone and the phone ending in –2170 on December 30, 2018, and that the last text message between the two phones was sent at 1:10 a.m. on December 31, 2018.

The detective who ran the "TRAS" report also testified that he located Mitchell's abandoned car and obtained a search warrant of the vehicle. He testified that the vehicle was found at the dead end of Whitehall Way. He testified that the rear bumper and rear passenger window of the car were damaged.

Cell-site location data of the phone ending in –2170 was also

entered into evidence.[3] The cellular record analyst who prepared the data noted that cell-site location data is not available for calls that are not completed. The report showed that Mitchell's phone called the –2170 number twice around 10:30 p.m. on December 30 but that the calls were not completed. At 10:38 p.m. and 10:41 p.m., the –2170 number made calls to or received calls from Mitchell's phone from the vicinity of McClendon's mother's apartment on Casanova Street. From 11:33 p.m. on December 30 to 12:10 a.m. on December 31, Mitchell's phone and the –2170 number attempted to call one another six times, with only two of those calls being completed. The completed calls, made at 11:37 and 11:48 p.m. on December 30, placed the –2170 number in the vicinity of Glen Emerald Park and

---

[3] "A cell site typically consists of a set of either three or six directional radio antennas mounted on a tower, light post, flagpole, church steeple, or side of a building. Unless powered off, a cell phone continuously scans its environment looking for the strongest signal, which generally comes from the nearest cell site. Each time a phone connects to a cell site, the connection generates a time-stamped digital record in the service provider's account records that includes the particular cell site and the specific antenna activated ('sector' information); such records are known as cell-site location [data]." *Lofton v. State*, 310 Ga. 770, 775 (2) n.3 (854 SE2d 690) (2021) (citing *Carpenter v. United States*, 585 U.S. 296, 300-301 (I) (A) (138 SCt 2206, 201 LE2d 507) (2018)).

9

Appellant's previous residence at Paradise East Apartments on Bouldercrest Road. Starting at 1:22 a.m., the –2170 number called various numbers, including McClendon, at 1:38 a.m. The first four calls, beginning at 1:22 a.m. and ending at 1:54 a.m., placed the caller near Glen Emerald Park and Paradise East Apartments. The last two calls, beginning at 2:47 a.m. and ending at 2:48 a.m., placed the –2170 number near McClendon's mother's apartment on Cassanova Street. The cellular record analyst testified that the –2170 number utilized a cell phone tower near Whitehall Way, where Mitchell's car was recovered, at approximately 10:45 a.m. on January 1, 2019.

Photographs of the crime scene, which were admitted into evidence, showed that Mitchell was found bare from the waist down, and that her sweatpants, underwear, and slippers were nearby. An investigator testified that they found a .40-caliber cartridge casing near the body. Photographic evidence showed that the casing was found only a few feet away from Mitchell's feet. Investigators were unable to lift any prints from the items found at the scene.

An investigator with the DeKalb County Police Department's homicide unit testified that Glen Emerald Park is a small park located on Bouldercrest Road "directly across" from Paradise East Apartments. He also stated that he received search warrants to perform extractions on Mitchell's phone and the phone ending in –2170 but that the extraction was unsuccessful on Mitchell's phone. He said that Mitchell's phone was never located and that the photos of her text messages displayed on her mother's tablet were the only evidence obtained on Mitchell's phone. The extraction on the phone ending in –2170 revealed that Mitchell's phone number was saved in the –2170 number's contacts as "Maya wants ounce" and that the user of the –2170 number attempted to delete the call logs with the contact "Maya wants ounce."

The extraction also revealed the –2170 number's internet search history, which showed that its user searched "breaking news Atlanta" and "channel 2 news breaking news murder" on the evening of December 31, 2018, and searched "Glen Emerald Park" on the evening of January 6, 2019.

The homicide investigator testified that he interviewed Lamar, McClendon, and Appellant at various times after the murder. He described Lamar as "very straightforward in his demeanor and his information that he provided." He testified that McClendon initially said that she and Appellant were together on the night of December 30, 2018, but after being presented evidence of their phone calls, "changed her story" and admitted that he left at some point in the evening. After interviewing McClendon, the investigator determined that Appellant was in sole possession of the phone number ending in –2170 "during this homicide." And as to his interview with Appellant, the investigator stated that Appellant did not provide an alibi for December 30, 2018, and December 31, 2018. The investigator also said that Mitchell's car was recovered on Whitehall Way on January 5, 2019.

The medical examiner who conducted the autopsy on Mitchell testified that the bullet entered through the back right side of her head near her ear, passed through the brain, and exited through her left ear. Due to the lack of soot and stippling, he determined that the

gun was "more than two to three feet away from [Mitchell]" when it was fired. Her only other injury was an abrasion on her right buttock, possibly indicating that she was dragged across a rough surface. The autopsy report listed her cause of death as a gunshot wound to the head. On cross-examination, the medical examiner testified that he was unable to establish Mitchell's time of death.

A firearms expert who worked for the Georgia Bureau of Investigation testified that after examining the bullet fragments, he concluded that the bullet fragments were from a .40[-]caliber weapon, consistent with being fired from a "hi[gh]-point .40[-]caliber pistol."

The parties stipulated that Appellant was serving probation as a felony first offender at the time of the shooting.

2. On appeal, Appellant contends that the evidence was insufficient to support his convictions as a matter of constitutional due process and as a matter of Georgia statutory law, see OCGA § 24-14-6. We disagree.

(a) When evaluating a challenge to the sufficiency of the

evidence as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt for the crimes for which he was convicted." *Ellington v. State*, 314 Ga. 335, 339 (2) (877 SE2d 221) (2022) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560 (1979)). We leave to the trier of fact "the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," and we do not "reweigh the evidence." *Harris v. State*, 313 Ga. 225, 229 (2) (869 SE2d 461) (2022) (citation and punctuation omitted).

Here, the evidence was sufficient to convict Appellant of Mitchell's murder and the other crimes of which he was convicted as a matter of constitutional due process. Viewed in the light most favorable to the verdicts, the evidence showed that Mitchell left Lamar's house on the evening of December 30, 2018, to buy marijuana from Appellant; that a phone number ending in –2170, which was in Appellant's sole possession at the time, messaged

14

Mitchell's phone and said to meet him at Glen Emerald Park; that Appellant left McClendon's mother's apartment that same night carrying a gun; that Mitchell was found dead with a gunshot wound to the head in Glen Emerald Park the following morning; that cell-site location data placed Appellant's phone at Glen Emerald Park late in the evening of December 30 and early in the morning of December 31; and that, during this time, Appellant was serving probation as a felony first offender. See *Carter v. State*, 305 Ga. 863, 867 (2) (828 SE2d 317) (2019) (circumstantial evidence supporting murder conviction included text messages between defendant and the victim which showed that defendant was the last person to be with the victim).

The evidence also showed that after Mitchell's death, the –2170 number, which was in Appellant's sole possession at the time, tried to delete call logs with Mitchell's phone on the –2170 phone and searched "breaking news Atlanta" and "channel 2 news breaking news murder" on the internet on December 31, 2018, and "Glen Emerald Park" on January 6, 2019. Further, Appellant lied to

15

Mitchell's parents and introduced himself as "Lee," told them that he was supposed to meet Mitchell on December 30 but that he "stood her up," admitted to investigators that he did not have an alibi for that night, and told her parents to look for Mitchell in various places, including Glen Emerald Park where he also said that a body had recently been found but that it was not on the news yet. Also, Mitchell's car was found abandoned on Whitehall Way, where cell-site location data placed Appellant on January 1, 2019. See *Gray v. State*, __ Ga. __, __ (2) (__ SE2d __) (2024) (noting that "the fact of an accused's . . . concealment, assumption of a false name, and related conduct [is] admissible as evidence of consciousness of guilt, and thus of guilt itself").

While Appellant argues the lack of eyewitnesses make the evidence insufficient, this argument is without merit because "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Plez v. State*, 300 Ga. 505, 506 (1) (796 SE2d 704) (2017). And as to Appellant's argument that he did not

16

have a motive to shoot Mitchell, "the State need not introduce evidence of motive in order to support a guilty verdict on the charge of malice murder." *Adams v. State*, 317 Ga. 342, 349 (1) (893 SE2d 85) (2023) (citation and punctuation omitted).

Taken as a whole, the evidence presented at trial authorized a reasonable jury to infer that Appellant and Mitchell had a sexual relationship and would meet late at night or early in the morning to engage in sexual activity; that Appellant directed Mitchell to Glen Emerald Park to meet; that Appellant left McClendon's mother's apartment on the evening of December 30 carrying a gun; that Appellant shot and killed Mitchell using that gun; and that, after killing Mitchell, Appellant left her car at the dead-end of Whitehall Way on January 1, 2019, where it was later discovered by investigators, conducted internet searches to see if her body had been discovered, attempted to delete call logs with Mitchell from his phone to conceal his guilt, lied about his name to Mitchell's parents to conceal his identity, suggested various locations to her parents to find Mitchell before suggesting they check Glen Emerald Park

17

where her body was ultimately discovered, demonstrating his knowledge of her death, and told investigators he did not have an alibi for the dates in question.

Because a reasonable jury could infer each element of each of the crimes for which Appellant was convicted, the evidence is sufficient as a matter of constitutional due process. See *Young v. State*, 305 Ga. 92, 94 (1) (823 SE2d 774) (2019) (holding that the evidence was constitutionally sufficient to support defendant's murder conviction where there were no eyewitnesses or DNA evidence linking defendant to the murder, but there was evidence that the two were in a contentious divorce and had recently participated in an unsuccessful mediation and that defendant fled the area and remained in hiding until he was arrested).

(b) As a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "However, not every hypothesis is reasonable, and

the evidence need not exclude every conceivable inference or hypothesis – only those that are reasonable." *Adams*, 317 Ga. at 348 (1) (citation, punctuation, and emphasis omitted). "Whether alternative hypotheses are reasonable is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law." Id. (citation and punctuation omitted).

Here, based on the evidence summarized above, we conclude that the jury was free to reject as unreasonable the hypothesis that Appellant did not shoot Mitchell, or, at the least, knowingly participate in Mitchell's murder, and that she was killed by someone else such as Appellant's "brother." Accordingly, the evidence was also sufficient to support Appellant's convictions under OCGA § 24-14-6. See *Taylor v. State*, 313 Ga. 5, 9-10 (867 SE2d 88) (2021) (affirming murder conviction under circumstantial-evidence statute where the evidence showed that defendant went to the area where the victim was shot only minutes before shooting; that after the shooting, he emerged looking distraught and was pacing the room,

19

that defendant made inconsistent statements to police officers; that defendant and victim had a lengthy, unusual conversation the day before the shooting; and that ballistics evidence showed that defendant's gun fired the fatal shot; and based on this evidence, the jury was authorized to reject as unreasonable defendant's alternative theories that a stranger or a family member killed the victim or that the victim committed suicide and accept the State's theory that defendant shot and killed the victim).

3. Appellant argues that the trial court erred in instructing the jury on party to a crime. We identify no error.

The trial court charged the jury as follows:

> Every party to a crime may be charged with and convicted of commission of the crime. A person is a party to a crime only if that person directly commits the crime or intentionally helps in the commission of the crime. Any party to a crime who did not directly commit the crime may be prosecuted for commission of the crime upon proof that the crime was committed, and that the person was a party to it, even though the person alleged to have directly committed the crime has not been prosecuted or convicted or is not amenable to justice.

"To authorize a requested jury instruction, there need be only

slight evidence supporting the theory of the charge." *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019). "Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime, which may be inferred from presence, companionship, and conduct before, during, and after the offense." *Collins v. State*, 312 Ga. 727, 732 (2) (a) (864 SE2d 85) (2021). While Appellant argues the State did not advance the party-to-a-crime theory, "even if the party requesting a charge on a particular theory did not advance that theory, that instruction is authorized as long as slight evidence supports the theory of the charge." *Bowman v. State*, 317 Ga. 457, 461 (2) (a) (893 SE2d 735) (2023).

Here, there was at least slight evidence that Appellant was a party to the crimes. The evidence showed that Appellant texted Mitchell late at night on December 30, 2018, to coordinate a place for them to meet; that, by means of those text messages, he directed her to Glen Emerald Park, where she was found dead the following day; and that, during the course of their correspondence, Appellant

told Mitchell that both he and his "brother" would be present and that his "brother" would provide her with the marijuana. This constituted at least slight evidence from which a jury could conclude that, at a minimum, Appellant was involved in the events leading up to and including Mitchell's murder, and thus, was a party to the crimes.

Therefore, the trial court did not err in instructing the jury on such a theory. See *Leeks v. State*, 303 Ga. 104, 106-107 (2) (810 SE2d 536) (2018) (holding that the trial court did not err in instructing the jury on party to a crime where the State did not indict defendant as such nor rely upon such theory in presenting its case to the jury, but there was testimony that defendant discussed robbing the store with his two co-indictees and that he fled the scene of the crime with one of his co-indictees, which was "at least slight evidence" supporting the party-to-a-crime theory). See also *Meadows v. State*, 316 Ga. 22, 24-25 (2) (885 SE2d 780) (2023) (holding that the evidence was constitutionally sufficient to support defendant's convictions of malice murder and related crimes as at least a party to the crimes

22

where the evidence showed that defendant and an unidentified driver arranged to meet the victim, that they met the victim at a gas station, and that either defendant or the driver shot and killed the victim from inside the driver's vehicle).

*Judgment affirmed. All the Justices concur.*